**In re John IAQUINTA, Debtor.**

**FIRST STATE BANK OF ALSIP, Plaintiff,**

v.

**John IAQUINTA, Defendant.**

**Bankruptcy No. 87 B 16734.
Adv. No. 88 A 00118.**

United States Bankruptcy Court,
N.D. Illinois, E.D.

April 28, 1989.

See also, Bkrtcy., 97 B.R. 959.

Harold Rosen, Mark E. Burt, Wolin & Rosen, Chicago, Ill., for defendant John Iaquinta.

Naomi H. Schuster, Sosin & Schuster, Ltd., Alsip, Ill., for plaintiff First State Bank of Alsip.

## MEMORANDUM OPINION

JOHN H. SQUIRES, Bankruptcy Judge.

This adversary proceeding comes before the Court on the amended complaint of First State Bank of Alsip (the "Bank") for a determination of the dischargeability of certain debts owed it by debtor defendant John Iaquinta ("Iaquinta") for violations of Section 523(a)(2)(A) and (a)(6) of the Bankruptcy Code. For the reasons set forth below, the Court having considered all the pleadings and evidence adduced at trial by way of testimony and exhibits, does hereby sustain the Bank's dischargeability complaint against Iaquinta based on section 523(a)(6) but denies the relief sought under section 523(a)(2)(A).

## I. JURISDICTION AND PROCEDURE

The Court has jurisdiction to entertain this adversary proceeding pursuant to 28 U.S.C. § 1334 and General Orders of the United States District Court for the Northern District of Illinois. This adversary proceeding constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(I).

## II. FACTS AND BACKGROUND

The Bank is engaged in business as an Illinois banking corporation with its principal banking house in Alsip, Illinois. Iaquinta was a shareholder and officer of Rocket Auto Sales, Inc. ("Rocket"). Rocket started business in 1983 and was engaged in the business of buying and selling used cars. It was formed, operated, and controlled by Iaquinta and his brother Peter. On or about August 2, 1983, Iaquinta executed a note and security agreement (the "first note") in favor of the Bank for the sum of $14,500.00. A certain 1983 Oldsmobile Toronado was secured under the first note.[1] About a year later on October 13, 1984, the Bank loaned Iaquinta the sum of $15,000.00. Iaquinta executed a note and security agreement (the "second note), secured by a 1979 Mercedes Benz 300SD. Subsequently, on August 29, 1986, the Bank loaned Iaquinta $3,000.00. Iaquinta executed a third note and security agreement (the "third note") and granted the Bank a security interest in a 1981 Oldsmobile Cutlass Brougham. Finally, on March 9, 1987, the Bank loaned Iaquinta and Rocket $13,854.97. Iaquinta individually and as president of Rocket executed a fourth note and security agreement (the "fourth note") in favor of the Bank secured by collateral consisting of a 1984 Oldsmobile Cutlass Supreme, a 1979 Mercedes Benz 240D, a 1979 Mazda RX7 and a 1979 Jeep CJ7.

Both Iaquinta and Rocket experienced financial reverses and Iaquinta filed a Chapter 7 petition on November 12, 1987. On February 16, 1988, the Bank filed its original complaint to determine dischargeability under section 523(a)(2)(A). Subsequently, the complaint was amended to include a cause of action under section 523(a)(6).

The substance of the amended complaint under section 523(a)(2)(A) is that Iaquinta misrepresented that he had or would acquire good and marketable title to the collateral and the Bank relied on such representation. The amended complaint further alleges pursuant to section 523(a)(6), Iaquinta, without the Bank's consent, knowledge or authority, sold the vehicles without substituting titles or remitting proceeds, thereby injuring the security interests in the collateral. The Bank seeks as damages the full balances owed on all four notes. The damages claimed exceed $25,000.00 plus accrued interest, costs and attorneys' fees. Iaquinta denied the substantive allegations of the amended complaint.

## III. DISCUSSION

### A. *Dischargeability Standards in the Seventh Circuit*

The party seeking to establish an exception to the discharge of a debt bears the burden of proof. *In re Martin*, 698 F.2d 883, 887 (7th Cir.1983). The standard of proof under section 523(a)(2), (a)(4) and (a)(6) is one of "clear and convincing evidence." *In re Bogstad*, 779 F.2d 370, 373 (7th Cir.1985). The discharge provisions of section 523 are construed strictly against a creditor and liberally in favor of a debtor. *In re Pochel*, 64 B.R. 82, 84 (Bankr.C.D.Ill. 1986). *See generally* 3 *Collier on Bankruptcy*, § 523.08[4] (15th ed. 1988).

### B. *11 U.S.C. § 523(a)(2)(A)*

Section 523(a)(2)(A) provides as follows:

(a) A discharge under section 727, 1141, 1228(a), 1128(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

.    .    .    .    .

---

1. The relevant portions of all the notes granted the Bank a security interest in the described motor vehicles. The notes provide in relevant part:

Debtor(s) has, or will acquire, good and marketable title to the Collateral, free and clear of all security interests (except that created hereby), liens and encumbrances and Debtor(s) will defend the same against the claims and demands of all persons.

Debtor(s) will not sell, lease, mortgage, pledge or encumber the Collateral, permit its identity to be lost, permit it to be levied upon or attached under any legal process, create any security interest herein (except that created hereby) or otherwise dispose of the same or any of Debtor(s) rights therein.

(2) for money, property, services, or an extension, renewal, or refinancing of credit to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

11 U.S.C. § 523(a)(2)(A).

■ In order to except Iaquinta's debt from discharge under this section, the Bank must establish three elements: (1) Iaquinta obtained the money or credit through representations either knowingly false or made with such reckless disregard for the truth as to constitute willful misrepresentation; (2) Iaquinta possessed an actual intent to defraud; and (3) the Bank actually and reasonably relied upon the false representation. *In re Kimzey*, 761 F.2d 421, 423 (7th Cir.1985); *In re Garman*, 643 F.2d 1252, 1256 (7th Cir.1980). For purposes of section 523(a)(2)(A), the timing of the fraud is critical. To recover under section 523(a)(2)(A), the Bank must prove by clear and convincing evidence that Iaquinta's fraud existed and occurred at the time the notes were executed. *In re Vissers*, 21 B.R. 638, 640 (Bankr.E.D.Wis. 1982); 3 *Collier on Bankruptcy* ¶ 523.08 at 523.49 (15th ed. 1988).

■ The evidence relative to Iaquinta's alleged fraudulent conduct focused on the representations made as to the ownership of three of the motor vehicles. At the time Iaquinta executed the notes and security agreements, he represented to the Bank that he had or would acquire good and marketable title to the collateral. However, Iaquinta admitted he never acquired title in his name to any of those vehicles. Iaquinta contends that he had no intent to defraud. Moreover, he states the course of dealings between the parties should govern notwithstanding the terms of the written documents. The course of dealings between the parties was informal and loose at best. The Bank never took action to monitor its collateral and apparently failed to discover that all of its security interests were unperfected.

From his testimony, the Court finds that Iaquinta was very experienced in buying and selling automobiles and knew the effect of granting a security interest in collateral. Iaquinta made no showing that his actions in failing to acquire title to any of the vehicles were merely inadvertent. Iaquinta's misrepresentations in that regard were either knowingly false or made with such willful disregard for the truth as to constitute willful misrepresentations. The Court can therefore reasonably infer his actual fraudulent intent. Furthermore, the granting of a subsequent security interest in one of the vehicles to another bank, is additional evidence of fraudulent intent.

■ The Bank's proof on the third element, however, is fatally insufficient. Actual reliance may be shown by unchallenged testimony that a creditor would not have extended that credit had it known the truth. *In re Kreps*, 700 F.2d 372, 376 (7th Cir.1983). Although the Bank may have actually relied on the representations at the time the notes were executed, it has not met the reasonable reliance test. The standard for measuring the reasonableness of a creditor's reliance is an objective one. In *In re Mitchell*, 70 B.R. 524 (Bankr.N.D.Ill. 1987), Judge Schmetterer set out a three-prong test to decide whether a creditor's reliance was in fact reasonable. Although *Mitchell* was a section 523(a)(2)(B) case, the Court finds that the reasonable reliance test set forth therein is applicable to section 523(a)(2)(A) as well. The following three factors must be considered when determining if reliance was reasonable: 1) the creditor's standard practices in evaluating credit worthiness; 2) the standards or customs of the creditor's industry in evaluating credit worthiness; and 3) the surrounding circumstances existing at the time of the debtor's application for credit. *Mitchell*, 70 B.R. at 527–528.

■ The evidence did not clearly establish what the Bank's standard practices were in evaluating credit worthiness of borrowers like Rocket and Iaquinta. *See In re Ardelean*, 28 B.R. 299, 301–302 (Bankr.N.D.Ill.1983). Furthermore, the proof did not include a showing that the Bank conducted any commercially reasonable investigation of Rocket or Iaquinta in accordance with

usual standards or customs of the commercial banking industry. Moreover, the Bank failed to 1) take any steps to verify ownership of the vehicles; 2) take any action to perfect its security interests; or 3) obtain the motor vehicle titles themselves.

Ray Wentler ("Wentler") testified as a Bank officer that money was lent to Iaquinta even though the Bank did not have the titles because Iaquinta was a good customer. The requirement that the loans be secured rather than unsecured should have routinely spurred some investigation and action on the Bank's part. *See, e.g., Bogstad,* 779 F.2d at 372–373 n.4. The only action taken by the Bank prior to the filing of the bankruptcy petition was having Iaquinta sign the loan documents. If reasonableness requires verification, then a creditor cannot be said to have acted reasonably if no verification took place. *In re Smigel,* 90 B.R. 935, 937–940 (Bankr.N.D.Ill.1988). The exception potentially excusing some investigation of credit worthiness due to a longstanding favorable credit relationship between the parties appears inapplicable. *See Garman,* 643 F.2d at 1257–1259; *Kreps,* 700 F.2d at 376. Accordingly, the Court must deny the relief sought under section 523(a)(2)(A).

### C. *11 U.S.C. § 523(a)(6)*

Section 523(a)(6) provides:

(a) A discharge under Section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

.        .        .        .        .

(6) for *willful and malicious injury* by the debtor to another entity or to the property of another entity.

11 U.S.C. § 523(a)(6).

■ In order for a debt to be held nondischargeable under section 523(a)(6), the creditor has the burden of proving that the injury resulted from an act that was both willful and malicious; *Kimzey,* 761 F.2d at 425; *United Bank of Southgate v. Nelson,* 35 B.R. 766, 768 (N.D.Ill.1983); *In re Hopkins,* 82 B.R. 952, 953 (Bankr.N.D. Ill.1988). The term "willful" means "deliberate or intentional," and "malicious"

means "wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill will." *In re Condict,* 71 B.R. 485, 487 (N.D.Ill.1987). The debtor need not act with ill will or malevolent purpose toward the injured party. *In re Hallahan,* 78 B.R. 547, 550 (Bankr.C.D.Ill. 1987). Thus, "a wrongful act done intentionally, which necessarily produces harm and is without just cause or excuse, may constitute a willful and malicious injury." 3 *Collier on Bankruptcy* ¶ 523.16 at 523–117 (15th ed. 1988). The phrase "willful and malicious injury" encompasses "willful and malicious conversion." *In re Meyer,* 7 B.R. 932, 933 (Bankr.N.D.Ill.1981).

■ The Court has carefully considered all of the admissible documentary evidence and the testimony of the witnesses. The 1983 Oldsmobile Toronado was conveyed to Arrowhead Auto Mart; the 1979 Mercedes Benz 300SD was transferred to Mark Auto Sales; and a security interest in the 1981 Oldsmobile Cutlass was granted to another bank which repossessed and resold that vehicle upon Iaquinta's default. The disposition of the four vehicles secured by the fourth note is unclear. It is apparent that the Bank did not receive any payment or other collateral on that obligation. Iaquinta knew the Bank's position would be impaired when he sold or allowed Rocket to sell all of the its collateral without remitting either the proceeds or tendering substitute motor vehicle titles of equivalent value. Iaquinta admitted that he controlled Rocket's business as well as the various sales of all the collateral. However, he contended that some dispositions were orally approved by Ron Hanson, a former Bank officer.

■ Unlike the fraudulent intent requirement of section 523(a)(2), the willful and malicious requirement of section 523(a)(6) neither necessitates a showing of reasonable reliance by the Bank nor does it focus on Iaquinta's scienter at the time of the extension of credit. Rather, the scienter condition under section 523(a)(6) is directed at the time injury occurred to the property. In this case, that time occurred when Iaquinta sold or allowed others from

Rocket to dispose of the collateral. In accordance with the course of dealings between the parties, Iaquinta failed to remit either the sale proceeds or substitute motor vehicle titles. Such conduct was corroborated by at least one of the Bank's officers. Iaquinta's theory of defense is that the course of dealings between the parties allowed sale or trade of the vehicles without the consent of the Bank, notwithstanding the written terms of the security agreement. Even if that theory is accepted, Iaquinta effectively converted the Bank's interest in the collateral when he failed to remit the sale proceeds or substitute motor vehicle titles.

Earlier decisions from this court have held that where a debtor knowingly converted a secured creditor's property and thereby deprived the creditor of its collateral, the debtor's act was both willful, malicious and hence nondischargeable under section 523(a)(6). *In re Scotella,* 18 B.R. 975, 976–977 (Bankr.N.D.Ill.1983). Under Illinois law, the tort of conversion includes an unauthorized act by which the owner or one having a right of property in the personal property is deprived of same. *See* 35 Illinois Law and Practice, *Trover and Conversion,* §§ 2, 3, and 7 (1983 and 1988 Supp.) and cases cited therein. Business persons are frequently presumed to know that harm will result from conversion of a secured party's collateral and a debtor who actively participates in such a conversion is personally liable. *In re Nicoll,* 42 B.R. 87, 90 (Bankr.N.D.Ill.1984).

In this case, the evidence is clear and convincing that Iaquinta had substantial experience in the used car business. He personally handled the trades and sales of the first three vehicles subject to the security interests granted under the first three notes. Iaquinta admitted he did not remit either the sales proceeds or substitute titles. He admitted he had executed, read and understood the significance of the notes and security agreements. Iaquinta's actions in selling and trading the vehicles were not mere innocent or technical conversions. Neither the informal course of dealing between the parties nor the Bank's failure to monitor and perfect its security interests in any of the collateral can serve to negate the security interests and excuse the conversions.

Iaquinta contends that the Bank consented to his conduct by continuing to make the loans without holding the motor vehicle titles or perfecting any of the security interest granted, thus acquiescing in the course of dealing between the parties. Iaquinta cites several Illinois decisions for the proposition that conversion must be predicated on a demand for possession accompanied by a refusal to turnover. Iaquinta's arguments are disingenuous and the cases cited are not controlling. Although the Bank may be criticized for not monitoring its collateral or perfecting any of its security interests, there is no dispute over the fact that Iaquinta expressly granted security interests in all of the subject vehicles. Those agreements were valid between the parties despite nonperfection of the security interests as to third parties. Iaquinta's unauthorized acts in fact deprived the Bank of its unperfected property rights. Such conduct constitutes actionable conversion under the authorities cited above and, in particular, the holding in *Scotella.*

1. Damages Under Section 523(a)(6)

The Bank seeks to have the full unpaid balances owed it on all four notes declared nondischargeable. The Court must determine the appropriate measure of damages. The fair market value of the converted collateral under section 523(a)(6) is the appropriate measure of damages for conversion. *In re Krause,* 44 B.R. 159, 163 (Bankr.N.D.Ill.1984); *see also* 35 Illinois Law and Practice, *Damages,* § 16 (1983 and 1988 Supp.). The Bank failed to offer valuation testimony concerning the collateral. The unpaid note balances are insufficient to clearly and convincingly prove the fair market value of the collateral at the respective times of conversion.

The Court extensively reviewed the record and evidence and is unable to find clear and convincing evidence as to the amount claimed of damages sustained. The record was devoid of any testimony as

to the value of the collateral securing the first, second and fourth notes. Wentler merely testified to the amounts owed on each note at the time of trial. Iaquinta admitted that he received two Eldorados and an unspecified amount of cash for the 1983 Oldsmobile. There was no testimony as to the value of the two Eldorados. Iaquinta testified that he received a Jaguar and an unspecified amount of cash for the first 1979 Mercedes. There was no testimony as to the value of those vehicles and cash or the value of the vehicles secured under the fourth note. Absent this testimony, the Court is unable to award any damages under the first, second and fourth notes.

■■ Relevant to the third note, Wentler testified $2,591.00 was unpaid. John Patrick, from another bank, testified that the salvage value of the repossessed 1981 Oldsmobile which secured the third note was only $1,030.00 upon its resale. In the absence of any other valuation testimony, the Court will find this to be the value of that converted collateral. Thus, the Court will award only the sum of $1,030.00 on the third note equal to the salvage value obtained when that vehicle was sold.

Although this result may seem harsh, the Bank had a heavy burden of proof on the damages and failed to make the requisite showing. Once a plaintiff has proved that he has been damaged, a definite amount of damages need be shown with reasonable certainty. *See generally*, Hunter, *Federal Trial Handbook*, § 80.5 (2d Ed. 1984); 35 Illinois Law and Practice, *Trover and Conversion*, § 16 and cases collected therein at n. 34–38. Damages can be awarded only when there is evidence authorizing or justifying the award of a definite amount, which cannot be predicated upon speculation. Hunter, *Federal Trial Handbook 2d*, § 80.5 (1984) and cases cited therein. The only awardable damages finding support in the evidence in accordance with the above authorities is $1,030.00.

■■ The *Krause* case notes that statutory interest (five percent per annum) can accrue from the time of conversion when there has been an unreasonable and vexatious delay of payment. *See also* 35 Illinois Law and Practice, *Trover and Conversion*, § 16; 15 Illinois Law and Practice, *Damages*, §§ 63, 65; Ill.Rev.Stat. ch. 17, para. 6402 (1987). The Bank failed to establish any of the approximate times when the conversions of its collateral occurred. Therefore, the Court cannot award prejudgment interest. Interest will accrue hereafter at the statutory judgment rate of nine percent per annum. Ill.Rev.Stat. ch. 110, para. 2–1303 (1987).

### D. *Recovery of Attorneys' Fees and Expenses*

■■ The Bank also seeks recovery of its attorneys' fees and other miscellaneous unpaid expenses. Although the notes and security agreements authorize collection of all costs and reasonable attorneys' fees, there is no provision for such award under section 523. Only assessment and taxation of a reasonable debtor's attorneys' fees for dischargeability cases involving consumer debts under section 523(a)(2) are allowed under section 523(d). *In re Crosslin*, 14 B.R. 656, 658 (Bankr.M.D.Tenn.1981), awarded attorney's fees under the contract with the debtor to a successful creditor who proved a case under section 523(a)(2)(A). The contrary view was espoused in *In re Woods*, 25 B.R. 16 (Bankr. D.Ore.1982). *Woods* specifically noted that the legislative history behind section 523(d) is unevenhanded in favor of the debtor not the creditor. 25 B.R. at 17–18. In the instant case, however, the Bank has not met its burden of proof under section 523(a)(2)(A).

Federal courts, in awarding attorney's fees, have generally applied what has been referred to as the "American Rule." The rule provides that in cases based upon or involving federal law, attorney's fees are not allowable absent a statutory basis or aggravated conduct justifying imposition of same. The Bank's action is founded on that federal statutory cause of action sounding in tort rather than arising solely under its underlying contract with Iaquinta. Therefore, the attorney's fee provisions in the notes and security agreements

are not controlling. The awardable damages are limited to the value of its collateral on the date of Iaquinta's conversion, plus statutory post-judgment interest. The remedy created by the Bankruptcy Code does not give the Bank a statutory right to attorney's fees. Therefore, this Court declines to tax Iaquinta with same. This result is consistent with decisions of other courts. *See In re Johnson,* 756 F.2d 738, 741 (9th Cir.1985); *In re Penney,* 76 B.R. 160, 162 (Bankr.N.D.Cal.1987). *See also, Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 259 n. 31, 95 S.Ct. 1612, 1622 n. 31, 44 L.Ed.2d 141 (1975) (award of attorney's fees in federal litigation reversed as contrary to the "American Rule").

### IV. CONCLUSION

For the foregoing reasons, the Court hereby finds part of the debt owed by Iaquinta to the Bank in the amount of $1,030.00 nondischargeable under section 523(a)(6). The Court will not, however, find in favor of the Bank under section 523(a)(2)(A) and denies the relief sought thereunder.

This Opinion is to serve as findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.