In re Jack M. **LUCE** and Billye M. Luce, d/b/a L & L International and L & L Leasing, Debtors.

**FIRST EQUIPMENT LEASING CORPORATION, Plaintiff,**

and

**Westinghouse Credit Corporation, Plaintiff,**

v.

Jack M. **LUCE** and Billye M. Luce, d/b/a L & L International and L & L Leasing, Defendants.

**Bankruptcy No. 386–34879 RCM–7. Adv. Nos. 387–3200, 387–3208.**

United States Bankruptcy Court, N.D. Texas, Dallas Division.

June 15, 1989.

---

Hance W. Burrow, III, Dallas, Tex., for FELC.

Thomas R. Trompeter, Dallas, Tex., for WCC.

Larry S. Parnass, Irving, Tex., for defendants.

## MEMORANDUM OPINION

ROBERT McGUIRE, Chief Judge.

Pursuant to Bankruptcy Rule 7052, the following are the Court's findings of fact and conclusions of law with respect to the trial held on December 2, 1988 and March 27, 1989. This was a consolidated trial, under 11 U.S.C. § 523, of two creditors against husband and wife debtors, Jack M. Luce and Billye M. Luce ("Defendants", or individually "JML" and "BML"), respectively.

*Claims of Plaintiff First Equipment Leasing Corporation ("FELC") Against BML*

FELC contends that BML is indebted to FELC as a guarantor in the sum of $475,-533.02 plus interest, attorney fees and punitive damages. FELC contends that this debt is for money, property, and services obtained by false pretenses, false representations, actual fraud and larceny, and that this debt is exempted from discharge in bankruptcy under the provisions of 11 U.S.C. § 523(a)(2)(A) and (a)(4). Alternatively, FELC contends that the money was obtained by the false pretenses, false representations or actual fraud or larceny of

JML, husband and partner of BML, under conditions such that the knowledge of the false pretenses, false representations, actual fraud and/or larceny should be imputed to BML such that this debt of BML should be exempted from discharge in bankruptcy under the provisions of 11 U.S.C. § 523(a)(2)(A) and (a)(4).

The claims and contentions of FELC are based on the facts and circumstances which arise out of three separate equipment leases. FELC is in the equipment leasing business, and entered into three leases with JML, d/b/a L & L International Enterprises ("LLIE") on or about August 10, 1984, January 24, 1985, and August 17, 1985. Each of the three leases was signed by JML and covered a multi-user computer system. In each instance, FELC advanced $115,500 to the supplier of the system, listed as either Advanced Computer Systems Corp. ("ACSC") or Multitron Corporation ("MC"). ACSC was run by Ed Ramirez, Sr. ("Ramirez"), who simply incorporated the business and it became MC. In each instance, the funds were not issued by FELC until JML signed an acknowledgment that the merchandise had been received in good working condition. Further, no payments were issued until BML had signed a guaranty of each lease, personally guaranteeing the lease payments.

FELC contends that none of the systems leased by FELC was ever delivered by ACSC to JML, LLIE, L & L Leasing ("LLL"), L & L International ("LLI"), or BML. FELC contends that seventy percent of the funds sent to MC or ACSC wound up in the hands of Defendants or their enterprises. FELC contends that this alleged ploy with FELC was exercised with numerous other leasing companies.

### Defenses of BML to Claims of FELC

BML contends that she has no personal knowledge of any money, property or services obtained by false pretenses, false representations, actual fraud or larceny, and that any knowledge or actions of JML should not be imputed to her so that her debt to FELC should be discharged in bankruptcy. BML asserts that she has no knowledge that any of the funds inured to her benefit.

### Claims of Plaintiff Westinghouse Credit Corporation ("WCC") Against Defendants

WCC filed a complaint challenging the dischargeability of the debt as to JML and BML, d/b/a LLI and LLL. The basis of the complaint is that JML and BML made false representations of fact to WCC (actually its predecessor in interest) in order to obtain funds purportedly for the purchase of certain equipment which they were to lease and that they did so knowingly and fraudulently and with the intent and purpose to deceive, and that WCC relied on these misrepresentations in advancing certain funds which have not been repaid in full, and a major portion of which is still due and owing.

### Defendants' Defenses to Claims by WCC

Defendants defend by denying any false representations, misrepresentations, or any culpable intent or purpose. They further state that any fraud perpetrated was done by Ramirez, individually and as the principal of Multitron, Inc. ("MI").

BML further asserts that her participation was limited to signing the guarantees on the leases at the request of her husband JML, and asserts that she was not directly involved in the transactions and had no knowledge of them.

Defendants further assert and defend on the ground that WCC has sequestered and taken possession of the equipment subject to this cause.

### Stipulated Facts

The parties stipulated to the following:

The complaints of FELC and WCC were filed pursuant to 11 U.S.C. § 523(a)(2), and are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(I). This Court has jurisdiction of this case pursuant to 28 U.S.C. § 1334. This proceeding is a consolidated adversary proceeding brought under Bankruptcy Rule 7001(6).

On or about December 15, 1986, Defendants filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code. Thereafter, in the Court's Order dated December 29, 1986, this Court ordered that March 23, 1987 would be the last day for filing complaints to determine dischargeability of any debt pursuant to 11 U.S.C. § 523. The complaints of WCC and FELC were timely filed.

Defendants are husband and wife, and have been husband and wife during all times in question.

Prior to the filing of Defendant's voluntary petition, there was pending in the 116th Judicial District Court of Dallas County, Texas, a law suit brought on behalf of WCC styled "Westinghouse Credit Corporation, Plaintiff, vs. Jack M. Luce, Individually, and d/b/a L & L International; Billye M. Luce, Individually and d/b/a L & L International; Multitron, Inc., doing business in its own name and as Advanced Computer Systems Corporation, Cause No. 86–2000–F." In this litigation, WCC, as the assignee and owner and holder of two certain lease rental agreements, sued Defendants for the unpaid net balances due under the above-mentioned lease rental agreements. WCC also sued for possession and sequestration of the collateral for the leases. Certain equipment was sequestered and sold pursuant to order of court for the sum of $6,000, the proceeds of which were placed in and remain with the Clerk of the District Court of Dallas County.

During the pendency of the above-mentioned law suit, Defendants filed their voluntary petition. The State Court lawsuit was abated before a final determination on the merits was made.

On or about June 29, 1984, Universal Leasing Corporation, now known as First U.S. Financial Corporation ("FUSFC"), as lessor, and Defendants, d/b/a LLI, as lessees, entered into and executed a certain "Lease Rental Agreement" ("Lease No. 1"). Thereafter, for good and valuable consideration, FUSFC assigned its interest as lessor therein to WCC, and WCC is now the owner and holder of Lease No. 1 and all rights of the lessor therein.

On or about May 16, 1985, FUSFC, as lessor, and Defendants, d/b/a LLI, as lessees, entered into and executed a certain "Equipment Lease" ("Lease No. 2"). Thereafter, for good and valuable consideration, FUSFC assigned its interest therein, as lessor, to WCC, and WCC is now the owner and holder of Lease No. 2 and all rights of lessor therein.

Defendants defaulted and failed to pay the monthly rentals provided by Lease No. 1, leaving an unpaid net balance of $102,583.79; Defendants have defaulted and failed to pay the monthly rental installments provided by Lease No. 2, leaving an unpaid net balance of $136,886.70, both figures being that amount which was due and owing at the time WCC instituted the hereinabove referenced State Court action on February 17, 1986. Defendants are indebted to WCC in the principal sum of $239,470.49 since September 17, 1986.

JML, d/b/a LLIE, entered into a lease with FELC on or about August 10, 1984 ("Lease A"). BML guaranteed Lease A. JML signed an acknowledgment that the multiuser computer system listed in Lease A had been delivered in good working order. In reasonable reliance on Lease A, the guarantee of Lease A, and the acknowledgment of delivery of Lease A, FELC paid to ACSC and/or MC a total of $115,500. The multiuser computer system set forth in Lease A was never delivered.

JML, d/b/a LLIE, entered into a lease with FELC on or about January 24, 1985 ("Lease B"). BML guaranteed Lease B. JML signed an acknowledgment that the multiuser computer system listed in Lease B had been delivered in good working order. In reasonable reliance on Lease B, the guarantee of Lease B, and the acknowledgment of delivery of Lease B, FELC paid to ACSC and/or MC a total of $115,500. The multiuser computer system set forth in Lease B was never delivered.

JML, d/b/a LLIE, entered into a lease with FELC on or about August 17, 1985 ("Lease C"). BML guaranteed Lease C. JML signed an acknowledgment that the multiuser computer system listed in Lease C had been delivered in good working or-

der. In reasonable reliance on Lease C, the guarantee of Lease C, and the acknowledgment of delivery of Lease C, FELC paid to ACSC and/or MC a total of $115,500. The multiuser computer system set forth in Lease C was never delivered.

Previously in the adversary proceeding filed by FELC (Adversary No. 387–3200), an agreed judgment and order of nondischargeability was entered against JML.

In the companion adversary proceeding filed by ITT Commercial Finance Corporation (Adversary No. 387–3170), an agreed judgment and order of nondischargeability was entered against JML.

In the companion adversary proceeding filed by AVCO Financial Services Leasing Company (Adversary No. 387–3205), an agreed judgment and order of nondischargeability was entered against JML.

In the companion adversary proceeding by Bell Atlantic Systems Leasing Corporation (Adversary No. 387–3207), an agreed judgment and order of nondischargeability was entered against JML.

BML is a partner of JML in LLL, LLI, and L & L Enterprises.

BML is indebted to FELC in the principal sum of $475,533.02.

### Findings as to FELC

█ JML obtained money, services and an extension of credit from FELC by false pretenses, false representations and actual fraud, other than a statement respecting his or an insider's financial condition.

Defendants were partners in LLI and LLIE during all pertinent times herein. As previously indicated, such partnership was partially stipulated to by all parties. BML submitted her proposed finding of fact No. 1 reading:

> Jack M. Luce and Billye M. Luce are partners in L & L International and L & L International Enterprises with different duties and responsibilities thereto. Jack M. Luce and Billye M. Luce worked in entirely different areas of that business.

The facts contained in such proposed finding are substantially accurate except that the word "entirely" is not accurate since, as shown by prior stipulated facts, BML guaranteed the FELC leases and signed the WCC leases. BML signed Plaintiffs' Ex. 17, a certificate of ownership on LLI showing that she was the owner of such business on May 26, 1983. Such document was filed in the assumed name records in the County Clerk's office of Dallas County, Texas.

The actions of JML with respect to FELC were done as part of the ordinary course of business of LLIE and LLI, a partnership between JML and BML. The knowledge and actions of JML should be and are imputed to BML. *Strang v. Bradner*, 114 U.S. 555, 561, 5 S.Ct. 1038, 1041, 29 L.Ed. 248 (1885); *McIntyre v. Kavanaugh*, 242 U.S. 138, 139, 37 S.Ct. 38, 39, 61 L.Ed. 205 (1916); 37 S.Ct. at 39; *In re Hankins*, 2 BCD 409 (Bankr.S.D.Ala.1976); *In re Cecchini*, 780 F.2d 1440 (9th Cir.1986); *FDIC v. Braemoor Associates*, 686 F.2d 550 (7th Cir.1982), *cert. denied*, 461 U.S. 927, 103 S.Ct. 2086, 77 L.Ed.2d 297 (1983) (applying §§ 12 and 13 of the Uniform Partnership Act); *In re Kasler*, 611 F.2d 308, 309–310 n. 3 (9th Cir.1979); 3 *Collier on Bankruptcy*, ¶ 523.08, 523–52 nn. 22 and 23 (15th ed. 1988); *Matter of Newmark*, 20 B.R. 842 (Bankr.E.D.N.Y.1982) (the principal was held liable for the fraudulent acts of the agent, where the agent was acting within the scope of his employment, even though the principal had no knowledge of the fraudulent misrepresentations of the agent). *Also see*, Kennedy, *The Discharge of Partners and Partnerships Under the Bankruptcy Code*, 38 VANDERBILT L.R. 857 at 895 n. 131, 896 and 899.

While there is insufficient evidence that BML participated directly in the fraud of JML, it is undisputed that JML was, at all times, acting on behalf of the partnership and in the ordinary course of business of the partnership, and that, as a partner, BML shared in the monetary benefits of such fraud.

A nondischargeable judgment should be entered as against BML for the principal sum of $475,533.02, plus interest. The re-

coverability of attorney fees will be discussed hereinafter.

This debt arises out of the same facts and circumstances as the debt of JML, which the parties have agreed is for money, property and services obtained by false pretenses, false representations and the actual fraud of JML.

When JML signed the acknowledgments that the equipment on leases A, B, and C had been delivered in good working order, he knew that such representations were false.

LLI or LLIE received approximately seventy percent of the funds delivered by FELC to MC and/or ACSC in connection with Leases A, B, and C.

JML participated in altering serial numbers to prevent leasing companies from determining that the leased equipment had not in fact been delivered.

BML signed two acknowledgments for a leasing company other than Plaintiffs herein acknowledging that under $6,000 worth of equipment had been delivered, when such equipment had not been delivered (Plaintiffs' Exs. 14 and 15).

### WCC Claims Against Defendants

The background facts and stipulations heretofore found and recited above are applicable to both claims herein. To the extent applicable, the facts in the FELC claim are supplemented by the findings made hereinafter.

Defendants were successful Amway distributors. They also engaged in purchasing computer components for the purpose of combining them into computer systems.

In order to obtain money for the computer enterprise, JML sought and obtained commercial financing, tendering certain equipment and other items as collateral. The general arrangement was that the finance company would pay ACSC for the full invoiced amounts and then lease the equipment to the Defendants, as heretofore described in the Stipulated Facts, for monthly payments which were to repay this loan amount, plus interest over a period of time—usually sixty months.

As previously indicated, in the case of WCC, the Defendants entered into two lease rental agreements. The first WCC lease was executed on June 29, 1984, through ULC, and thereafter assigned to WCC, and was in the amount of $166,083.75. The second WCC lease was executed on May 16, 1985 with FUSFC, and thereafter assigned to WCC, and was in the amount of $184,744.98. In trial testimony, BML denied signing the guaranty on the second WCC lease, although there was no dispute that both BML and JML signed the lease d/b/a LLI.

The Defendants ceased making lease payments on both leases on October 1, 1986. Both leases went into default and were accelerated. As of November 24, 1986, there was due and owing, after all credits and offsets, a balance of $102,583.79 on the first lease and a balance of $136,886.70 on the second lease, for a total amount of 239,470.49 due WCC by the Defendants.

As a result of the Defendants' default on the lease agreements, WCC instituted suit in November, 1986 in the 116th Judicial District Court of Dallas County, Texas. A Sequestration Order was obtained, and certain computer equipment was sequestered and sold, pursuant to Court Order, for a sum of $6,000. The $6,000 is being held by the clerk of the District Court of Dallas County.

The Defendants take the position that by sequestering this equipment, WCC has recovered its equipment which was the collateral for the Lease Agreement, and by so doing, has no legal cause to object to the discharge. The Defendants cite no authority for this proposition. Texas law does not construe the sequestration as an election of remedies. *Custom Leasing, Inc. v. Texas Bank & Trust Co. of Dallas*, 491 S.W.2d 869, 871 (Tex.1973). Neither would Texas law construe such a sequestration as an accord and satisfaction. *H.L. Brownie Choate, Inc. v. Southland Drilling Co., Inc.*, 447 S.W.2d 676 (Tex.1969); *Blaylock v. Akin*, 619 S.W.2d 207 (Tex.App.—Texarkana 1981, writ ref'd n.r.e.). The proceeds

of the sequestration are retained by the clerk of the Court of Dallas County. At the time of the sequestration and sale, there were claims made by the other intervenor financing company creditors against these funds contesting WCC's right to them. No determination of that issue has yet been made by the Dallas County District Court. To the extent necessary, the Court lifts the stay with respect to such action to allow all such parties to proceed to judgment. Since all the parties in such State Court action are not before this Court, it will be up to the State Court to determine ownership of the funds involved. If WCC recovers any of such funds, then it will have to give appropriate credit.

Apparently, the Defendants also contest, as part of their position, the validity of the court-ordered sale pursuant to sequestration in the amount of $6,000. The Court finds that Defendants have failed to show any impropriety in the sale.

JML did not limit financing to equipment and supplies actually obtained. Rather, he arranged to have invoices and documents attached to applications for financing, with numerous inventory financing companies, listing items never in fact received. He also executed receipts certifying the delivery and acceptance of the equipment, when in fact he knew it did not exist. In order to cover up this deficiency when the representatives of these finance companies would come to inspect the equipment by serial number to document its availability, the serial numbers on the equipment that the Defendants in fact had were changed by JML and agents to fit the numbers appropriate to the particular financing documents. Only two of over fourteen systems were actually delivered. Approximately fifteen of seventeen leases were funded. Thus, the equipment on two systems was utilized to purportedly substantiate and be the collateral for at least fourteen different transactions. Although the loan proceeds were paid by the finance companies direct to MC or ACSC, as the seller, in fact a substantial portion of these funds was transferred to the Defendants pursuant to a secret arrangement of JML with Ramirez and MC. JML was aware of this mode of operation, was aware that the great majority of equipment on which the creditors were advancing funds was not in existence, nor in the Defendants' custody and control, and, therefore, would not be available to support the funds advanced, and knew that the serial numbers were being changed so as to deceive the finance companies, including WCC. JML knowingly and intentionally diverted over $500,000 of the funds for the personal use and benefit of him and his wife, to the detriment of the finance companies, including FELC and WCC. The equipment on the first WCC lease was substantially delivered, however, the equipment on the second WCC lease was not delivered.

As shown by WCC's Exs. 10W and 20W, the sheriff's list in the State Court suit shows that at least eight printers on WCC's first lease were picked up by the Sheriff and sold, to wit: serial numbers 587J24, 587J30, 587J25, 587J26, 587J27, 587J31, 587J32, and 587J33.

JML may have changed the serial numbers on the remainder of the WCC equipment on the first lease after its receipt as part of the overall fraudulent plan. If so, same would be willful and malicious activity within the meaning of § 523(a)(6), since same would have been a conversion of WCC's collateral. *In re Scotella*, 18 B.R. 975, 976–977 (Bankr.N.D.Ill.1982); *In re John Iaquinta*, 98 B.R. 919 (Bankr.N.D. Ill.1989); *In re Dean*, 79 B.R. 659 (Bankr. N.D.Tex.1987) (discussing "wilfull and malicious"); *Harrell v. BancTexas*, 1 TBCR 231 (1987). The fair market value of the converted collateral under § 523(a)(6) is the measure of damages for conversion. *In re Krause*, 44 B.R. 159, 163 (Bankr.N.D.Ill. 1984); *In re John Iaquinta, supra.* WCC failed to offer valuation testimony on allegedly converted collateral on the first lease. The unpaid contract balances on the first lease are insufficient to prove the fair market value of any collateral converted by JML on the first lease with WCC. *In re John Iaquinta, supra.* The party seeking to establish an exception to discharge has the burden of proof. *In re Martin*, 698 F.2d 883, 887 (7th Cir.1983).

As to the second WCC lease, JML, on behalf of LLI, (1) made false representations to WCC concerning the existence of such equipment; (2) such representations were material and were made with the purpose and intention of deceiving WCC; (3) WCC reasonably relied upon the representations of JML concerning the equipment and financing terms; and (4) WCC sustained a loss of $136,886.70, plus interest, as a result of the false representations. Such representations were fraudulent within the meaning of § 523(a)(2)(A). Because BML was a partner with JML in LLI, then for the reasons stated on page 9 hereof, the Court finds and holds that the debt of Defendants to WCC in the amount of $136,886.70, plus interest, is a result of actual fraud and is non-dischargeable under § 523(a)(2)(A) as to her also.

As to the first lease, WCC offered some evidence from JML's testimony as to his intent not to have the equipment on the first lease remain in one place (contrary to some of the wording in the first WCC lease). However, for reasons previously stated, the proof of WCC's damages on the first lease is insufficient. Additionally, the overall scheme of JML was not fully in place upon the delivery of the first leased equipment and any possible movement of equipment was not of the sort contemplated by the fraudulent scheme that fully developed after the first delivery.

■ The next issue is whether Plaintiffs are entitled to attorney fees incurred in this adversary proceeding. Cases supporting recovery of attorney fees include *First American National Bank v. Crosslin*, 14 B.R. 656 (Bankr.M.D.Tenn.1981); *In re Martin*, 761 F.2d 1163, 1168 (6th Cir.1985); *In re Hunter*, 771 F.2d 1126 (8th Cir.1985); *Chase Manhattan Bank v. Birkland*, 98 B.R. 35 (W.D.Wash.1988). Other cases support a conflicting view—*In re Elliott*, 93 B.R. 776 (Bankr.M.D.Fla.1988); *In re Penney*, 76 B.R. 160 (Bankr.N.D.Calif. 1987). Because no statutory right to creditor attorney fees is set forth in § 523, the foregoing two courts disallowed the creditors' requests for attorney fees in prosecuting the adversary. Accord, *Dougherty v.*

*Brackett*, 51 B.R. 987 (Bankr.D.Col.1985); *In re Lewis*, 31 B.R. 83 (Bankr.W.D.Okla. 1983); *Matter of Myers*, 61 B.R. 891 (Bankr.N.D.Ga.1986); *In re Gedeon*, 31 B.R. 942 (Bankr.D.Col.1983). *See also, In re John Iaquinta, supra.* In dicta Judge Ginsberg discussed the issue:

In general, attorneys' fees awarded by a state court based on state statutory or contractual grounds are nondischargeable where the bankruptcy court finds that the underlying debt is itself nondischargeable. *Cf. In re Hunter*, 771 F.2d 1126, 1131 (8th Cir.1985); *See In re Martin*, 761 F.2d 1163, 1168 (6th Cir.1985); *In re Foster*, 38 B.R. 639, 641–42 (Bankr. W.D.Tenn.1984); *Matter of Loken*, 32 B.R. 205, 209 (Bankr.W.D.Wis.1983). Illinois courts may grant attorneys' fees to a prevailing party under Ill.Ann.Stat. ch. 110, § 5–108 (Smith–Hurd 1985). The state court here awarded attorneys' fees to the plaintiff as a consequence of the debtor's fiduciary defalcation. The debtor did not challenge the state court's authority to grant fees. Indeed, he agreed by stipulation that the plaintiff could recover them. This Court has found that the underlying debt of $37,550 is nondischargeable. Likewise, the attorneys' fees awarded by the state court based on that underlying debt are nondischargeable. Those attorneys' fees are part of the state court judgment. In essence, the state court held that the attorneys' fees were part of the damages which this plaintiff suffered as a result of the debtor's fraud or defalcation while acting as a fiduciary. Just as the debtor is collaterally estopped from relitigating the dischargeability of the main debt, he is also collaterally estopped from relitigating the question of whether attorneys' fees are to be included in the amounts which are nondischargeable. A sharp contrast must be drawn between the prepetition state court attorneys' fees which the plaintiff seeks to have determined to be nondischargeable in this proceeding and the postpetition attorneys' fees incurred by the plaintiff in litigating this dischargeability complaint in this Court. The overwhelming weight

of authority is that the latter type of attorneys' fees are dischargeable because the Bankruptcy Code does not provide for the awarding of attorneys' fees for creditors who prevail in a dischargeability complaint. *See e.g., In re Martin,* 761 F.2d 1163, 1168 (6th Cir.1985); *In re Chick,* 53 B.R. 697, 704 (Bankr.D.Or. 1985); *Dougherty v. Brackett,* 51 B.R. 987, 989 (Bankr.D.Colo.1985); *Matter of Benedict,* 15 B.R. 675, 678–79 (Bankr.W. D.Mo.1981). *Contrast* 11 U.S.C. § 523(d). However, that question is not now before the Court.

*In re Levinson,* 58 B.R. 831, 837 n. 7 (Bankr.N.D.Ill.1986). (Actually, the *In re Martin* opinion cited by the *Levinson* court would be authority for a contrary view, where the underlying contractual debt providing for attorney fees was based on a false financial statement). The court, in *In re Hunter, supra,* talks in terms of the attorney fees being an ancillary obligation to the debt. While this may permit its recovery under § 523 when brought forward in a prepetition State Court judgment, the wording of § 523 appears to limit recovery of attorney fees incurred in a bankruptcy adversary proceeding under § 523. *In re Fulwiler,* 624 F.2d 908 (9th Cir.1980) (non-dischargeability proceeding in bankruptcy is not one in tort or contract to which state law providing for attorney fees should apply). *In re Johnson,* 756 F.2d 738, 740 (9th Cir.1985). *In re Fulwiler* was an Act case where the debtor was attempting to recover from a creditor for the filing of an allegedly harassing non-dischargeability complaint. The court in *In re John Iaquinta* stated:

Federal courts, in awarding attorney's fees, have generally applied what has been referred to as the "American Rule." The rule provides that in cases based upon or involving federal law, attorney's fees are not allowable absent a statutory basis or aggravated conduct justifying imposition of same. The Bank's action is founded on that federal statutory cause of action sounding in tort rather than arising solely under its underlying contract with Iaquinta. Therefore, the attorney's fee provisions in the notes and security agreements

are not controlling. The awardable damages are limited to the value of its collateral on the date of Iaquinta's conversion, plus statutory post-judgment interest. The remedy created by the Bankruptcy Code does not give the Bank a statutory right to attorney's fees. Therefore, this Court declines to tax Iaquinta with same. This result is consistent with decisions of other courts. *See In re Johnson,* 756 F.2d 738, 741 (9th Cir.1985) [*Debtor sought attorney fees per state statute for prevailing in automatic stay litigation*]; *In re Penney,* 76 Bankr. 160, 162 (Bankr.N.D.Cal.1987). *See also, Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 259 n. 31 [95 S.Ct. 1612, 1622 n. 31, 44 L.Ed.2d 141] (1975) (award of attorney's fees in federal litigation reversed as contrary to the "American Rule").

1989 Bankr. Lexis 640 at 17.

For some § 523(a)(5) cases denying attorney fees in bankruptcy adversary proceedings, in the context of § 523(a)(5), also see, *In re Barbre,* 91 B.R. 846 (Bankr.S.D.Ill. 1988); *In re Lathouwers,* 54 B.R. 205, 207 (Bankr.D.Col.1985); *In re Smith,* 42 B.R. 628 (Bankr.E.D.Mo.1983).

No attorney fees will be allowed to the Plaintiffs for attorney fees incurred in this adversary proceeding.

Judgments will be entered in accordance with the foregoing opinion.