In re Sidmond J. PAWLINSKI, Debtor.

Harry GREEN, Jr., Plaintiff,

v.

Sidmond J. PAWLINSKI, Defendant.

Bankruptcy No. 92 B 12725.
Adv. No. 92 A 01249.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

July 20, 1994.

Kenneth J. Cohen, Niles, IL, for plaintiff.

Douglas A. Wellman, Chicago, IL, for debtor/defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING TRIAL

JACK B. SCHMETTERER, Bankruptcy Judge.

This Adversary proceeding relates to debtor's Chapter 7 bankruptcy. The creditor/plaintiff Harry Green ("Green") brought this action to seek non-dischargeability of a judgment debt owed to him by Sidmond J. Pawlinski ("Debtor"). The issue is whether funds advanced by Green for the purpose of entering into limousine and automobile resale businesses and the judgment thereon constitute a debt that is non-dischargeable under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(4). Following trial, the Court now makes and enters the following Findings of Fact and Conclusions of Law, pursuant to which the debt is found non-dischargeable in part and dischargeable in part.

### FINDINGS OF FACT

#### The Limousine Business

This is a sad case about a trusting and vulnerable man conned by debtor-defendant and another sharpie. Plaintiff Green is a thirty-four year old man who is physically handicapped to the extent requiring his constant use of a wheelchair since 1981. He has a ninth grade education. He is a person who values friendship and companionship. The combination of his desire for companionship and his lack of education made him an individual who was an easy subject to be deceived. He obtained a great deal of money from settlement of a case related to his disability, but lacked experience in handling money. Debtor and his business partner David Gurich ("Gurich") saw Green as an easy and attractive mark. Inexperienced and naive, Green was a classic target.

Green was not able to transport himself. He frequently called upon one of the limousine services offered by Debtor and Gurich. Debtor then operated a limousine service called Fantasy Limousine ("Fantasy"). Gurich then operated a limousine service known as Crest Limousine ("Crest"). The two businesses also operated together under the

trade name "Fantasy/Crest Limousine" ("Fantasy/Crest"). Fantasy and Crest operated several limousines. Following plaintiff's payments of monies described below, the two businesses were supposedly incorporated under the name White Eagle Enterprises. As to whether that actually happened, persuasive corroboration is lacking. However, Fantasy and Crest were sole proprietorships of Debtor and Gurich when Green paid the money that is the subject of this proceeding.

Debtor and Green first met when Debtor drove him as a passenger in a limousine. He learned that Green had money. Green paid at least $400.00 for each limousine ride. On a subsequent trip, one of the limousine drivers suggested that Green consider buying a limousine. He offered to put Green in touch with one of his bosses, Debtor or Gurich. Debtor and Gurich both went together to Green's home located in Lyons, Illinois, in December of 1987, for the purpose of persuading him to purchase one or more limousines. They knew he did not have any experience in the limousine or automobile industry. However, they told Green he could earn large amounts of money if he would purchase a limousine and allow them to operate it for him. They also told Green that the proceeds from the operation of a limousine would be divided as follows: 40% to Green; 30% to Fantasy/Crest; and 30% to the limousine driver.[1] They told Green he would earn even more money, and always have a limousine at his disposal, if he purchased two limousines instead of one. They did not then mention insurance needs relating to the vehicles.

Green agreed to buy two limousines. Gurich wrote out a check on Green's account in the amount of $53,000.00, payable to Crest Limousine (Debtor's limousine business). Green signed the check and delivered it to Debtor for Debtor to use in purchasing two limousines for Green. In return, Green received a receipt signed both by Debtor and by Gurich, which provided:

1. Fantasy/Crest had entered into similar agreements to operate limousines in the past. Fantasy/Crest had such an arrangement to operate the limousine of a Mr. Salerno. Under that agreement, Mr. Salerno was to receive 30% of the

12/9/87

*Received* from Harry Green $53,000 (fifty three thousand dollars) *for the purchase of two 1985 Cadillac limousines.*

(Emphasis supplied.)

Debtor went to Indiana to purchase the limousines. There he used Green's money to buy the two limousines. One was white, the other silver. They were purchased from a company called Indy Connection. Debtor and another driver then brought both vehicles to Green's home so Green could inspect the limousines he thought he had purchased. Debtor told Green these were his vehicles. Unknown to Green, however, the titles on those limousines listed Fantasy and Crest as the owners. Green was listed on each title only as a lien-holder. He was not told and did not learn at the time that the two vehicles purchased with his $53,000.00 were titled in the names of the businesses of Debtor and Gurich.

Debtor testified at trial that Fantasy and Crest were titled by him as owners of the limousines because the Illinois Secretary of State's office would not license those vehicles for operation as a livery service unless they were titled in the name of a livery company. However, Debtor offered no evidence to corroborate this assertion. Moreover, Green was never told the vehicles could not be titled in his name, and he never approved the titling arrangement decided upon by Debtor.

On January 15, 1988 (five weeks after the $53,000.00 was paid), Debtor and Gurich returned to Green's home and for the first time these men informed him that they could not operate the limousines because those vehicles were not insured. They told Green that if he did not immediately advance a $5,547.00 check for the insurance, he would lose his previous investment. Green assented to their joint request. His check was made payable to the order of Crest Limousine, and was later endorsed and deposited by Gurich. However, this was the means requested by both Debtor and Gurich to entrust both of

gross income from his vehicle. The amount actually received by Mr. Salerno weekly was two to three hundred dollars. Mr. Green, in contrast, never received payments or any business accounting.

them with monies to buy insurance for the two vehicles purchased with Green's money. Green was told by Gurich and Debtor that he would get the insurance money back promptly, but Green was never repaid.

It was established at trial that, in fact, the entire $5,547.00 thus entrusted to Gurich and Debtor was not used to buy insurance, and the insurance actually purchased was therefore inadequate. The Court gave Debtor ample opportunity to offer proof of his contention that full insurance was purchased and that the $5,547.00 was fully used for insurance, but he was not able to offer such proof. Not more than one-quarter of the $5,547.00 was paid toward insurance for the two limousines that the insurance was to cover. Consequently, the insurance had lapsed sometime before July 1988, when the silver limousine was in an accident in Alpine Valley, Wisconsin. Repairs were not covered by any insurance. Debtor had the car towed to Lyons, Illinois, for repairs, which were made but never paid for. That vehicle was never recovered. The final disposition of that silver limousine was not established by proof.

Following state court litigation, the white limousine was eventually turned over to an attorney on Green's behalf and sold for $9,000.00.

Green was never paid or given an accounting for any profit from operation of the two vehicles. Adding insult to injury, Green was required to pay for all limousine rides he took in the two cars he had paid for, at least $400.00 for each ride.

### Midway Motors

On January 30, 1988 (two weeks after the insurance check was obtained), Debtor and Gurich again contacted Green. This time they suggested that he join with them in a different business, the business of buying and reselling vehicles. That business was to be known as Midway Motors ("Midway"). Green was convinced. He signed and delivered to them a check in the amount of $25,000.00, payable to Marquette National Bank for use in opening a new account for the new business, Midway. They left Green's home with that check. However, that same day, Debtor and Gurich returned to Green and told him there was an emergency, and they needed $35,000.00 instead of $25,000.00. They said the deal would collapse unless they were given $35,000.00. They said they could not immediately return the first check because it was being held as "security" until they could get the second check. Green was assured by both Gurich and Debtor that the $25,000.00 check was not going to be cashed, even though it had been certified. Accepting that assurance, Green gave them another check for $35,000.00, this one payable to Crest Limousine, as Debtor and Gurich requested. However, contrary to the representations of Debtor and Gurich, the first check for $25,000.00 was deposited by them into the Midway account at Marquette Bank. The $35,000.00 check was deposited by them into the Crest Limousine account. Plaintiff Ex. 18. They never returned any part of the proceeds of either of those checks to Green.

As part of the foregoing discussion, Debtor and Gurich orally agreed with Green that they would each contribute $300,000.00 to start and operate Midway. The parties agreed that profits and losses of Midway would be split three ways. Debtor and Gurich represented that they had the ability to make their promised investments. However, Debtor and Gurich never made any of their promised contributions to Midway, nor did the evidence show that they ever had credit or funds in that magnitude available to invest, or anything close to it. Debtor testified that he deposited $15,000.00 into the Midway account following sale of some of his personal property. However, Debtor did not offer persuasive corroboration of his alleged deposit. When he attempted to identify deposits he allegedly made to the Midway account on Midway's bank statements, he pointed instead to deposits that he had earlier identified as proceeds from the sale of a limousine. Debtor testified glibly, but not persuasively, and did not corroborate his recollections from independent evidence.

In May of 1988, the different limousine businesses were experiencing financial problems. Debtor generally handled the Midway Bank account and other accounts of the different entities. Indeed, Debtor was the only signatory on the Midway checking account.

All payments from that account were drawn by him. He shuffled money between accounts, from the Midway accounts to Crest, Fantasy, and White Eagle Enterprises, to enable him to pay bills and salaries and keep those businesses afloat. Midway was never incorporated. Corporate formalities were not followed nor were tax returns filed for Midway. Green never received informational reports regarding the Midway account or his ownership. During the next few months, there were only three deposits to, but numerous withdrawals from, the Midway account, leaving that account almost empty. Debtor claims that four automobiles were purchased for resale by Midway Motors. However, he was only able to show that Midway received payment for one such limousine. Little of the funds withdrawn from the Midway account was actually used for its benefit. The money withdrawn from the Midway account was used for other purposes: (1) money spent to repair cars that did not belong to Midway Motors; (2) money spent to purchase three cars from New York which were never titled to Midway Motors; and (3) checks written to cover salaries, expenses, and fund transfers to other businesses owned by Gurich and Debtor.

### Auto Repairs

Over $4,818.18 was spent repairing cars that did not belong to Midway Motors. The first check drawn from the Midway account, in the amount of $171.98, was used to repair a crankshaft on a vehicle that was owned by Debtor's business, Fantasy. Group Ex. 30(A). On February 12, 1988, a check labelled as Group Exhibit 30(c) was written in the amount of $1,926.00 for repairs on a Cadillac that was not owned by Midway. Group Ex. 30(C). A check was written in the amount of $1,000.00 to Archer Auto Parts on February 14, 1988, to repair one of the two original limousines purchased by Green (but titled to Fantasy and Crest). Group Ex. 30(D). Check No. 375 was written to Armondo Lopez on March 5, 1988 in the amount of $1,720.20 to pay for repairs on one of Green's limousines.

The expenditures of these funds did not benefit Midway in any way.

### Salaries and Expenses

A number of checks were written on the Midway account for salaries to Gurich and Debtor, although Green did not receive any salary from Midway Motors and did not authorize Midway Motors to pay any salaries. Moreover, since Midway was never incorporated as planned, there was no board of directors to elect officers or authorize salaries. A total of $2,000.00 was paid to Gurich for salary, while Debtor received $2,500.00. See Group Ex. 30 (Check Nos. 374, 376, 380, 381, and 382).

Debtor testified that at least two other checks were transfers of funds to businesses owned by Debtor and Gurich. On March 9, 1988, Check No. 378 was written to Crest Limousine in the amount of $5,000.00. On June 1, 1988, a check for $2,000.00 was written to Fantasy. Group Ex. 30 (349). This latter check was then endorsed by Debtor and deposited directly into his personal account.

Debtor testified that Midway hired a consultant, Esralew, to help find financing for Midway. Two checks totaling $3,000.00 were written to Esralew as a retainer and to compensate him for his services. Group Ex. 30(E) and (377). Plaintiff did not rebut the evidence that funds paid to Esralew were for a study to benefit Midway, although that evidence was somewhat incongruous in light of failure to incorporate the business and use of it as something of a piggy bank for Debtor and Gurich.

### Purchase of Automobiles

Three automobiles were purchased in the name of Midway from Gaines Service Leasing Company in New York. These three automobiles were identified as two 1986 Lincoln Town Cars and a 1985 Buick. On February 12, 1988, (two weeks after the initial investment in Midway), Green was induced by Debtor and Gurich to write a personal check for $29,700.00 to Gaines Service Leasing in payment for these cars as an additional investment by him in "Midway". Plaintiff Ex. 5. Debtor was with Green when he signed the check and helped him get the check certified. A check in the amount of

$1,000.00 was later drawn from the Midway account, payable to West Lawn Currency Exchange on February 22, 1988, to pay the balance remaining on the three cars. Group Ex. 30(H). On February 19, 1988, Gurich was reimbursed $1,500.00 for his travel expenses related to the purchase of these three cars. Group Ex. 30(G). Two other persons were each paid $200.00 for transporting two of the vehicles. Group Ex. 30(I) and (J). The Midway account was also used to pay Crest $1,500.00 for repairs on the three cars on March 4, 1988. Group Ex. 30 (373). The total thereby spent on the three cars purchased from Gaines Leasing Service was $34,100.00.

However, there was nothing in the transaction with Gaines Leasing Service to indicate that the purchase of the cars benefited Midway. The bill of sale for the cars listed the owner as Crest Limousine. Plaintiff Ex. 19. The cars were never titled in Midway's name. Debtor testified that Gurich took the cars with an open title to avoid transfer taxes, because Midway intended to sell the cars. The first car, a 1985 Cadillac was sold to a city official in Forestview. However, it is not known how much was received for the car or where the funds were deposited. No deposits to the Midway account correspond with the alleged sale for the benefit of Midway. Debtor opined that the funds were deposited into the Crest account. What is clear is that such funds were due Midway, but did not go into the Midway account.

Gurich and his wife took the other two cars purchased from Gaines Service Leasing for their personal use. They did not pay for such use. The car that was being driven by Gurich's wife caught fire in their driveway in July 1988. Debtor claims he then learned for the first time that the cars were not insured. No money was recovered for the car damaged by fire. The third car purchased from Gaines Motor Leasing is still unaccounted for and may be in Gurich's possession. Debtor testified that he never asked Gurich about the disposition of the car.

Debtor alleges that Midway also purchased a 1986 Cadillac limousine for resale. Crest was paid $10,000.00 on February 12, 1988, toward the limousine. Group Ex. 30(B).

The balance for the limousine, $19,500.00, was paid to Indy Connection on February 18, 1988. Group Ex. 30(F). The car was never titled in the name of Midway. Debtor explained that the car was never titled in Midway's name because Gurich had arranged for its resale before it was purchased. Deposits made to the Midway account, aside from the funds supplied by Green, support Debtor's testimony that Midway sold the limousine it had purchased. A total of $28,492.03 was deposited in the Midway account on February 18 and 16 and March 4, 1988, apparently from that resale. Thus, Midway apparently lost money on the transaction (although it is possible, but not established, that not all funds received were deposited). Taken on its face, this purchase and sale simply transferred part of plaintiff's investment into a cash receipt in a smaller amount than that used for the purchase.

### Judgment in State Court

Green filed suit based upon the foregoing facts in state court. On December 21, 1989, Judge Reynolds of the Circuit Court of Cook County, Chancery Division, entered judgment in case No. 88 CH 4905 against Debtor in the amount of $197,984.50. This judgment included an award of attorneys' fees. The parties agree that the doctrines of collateral estoppel and res judicata apply only to the amount of total debt thereby determined to be owed to Green. However, the state court judgment does not determine whether or not this debt or any part of it is dischargeable under the Bankruptcy Code. Other than the pleadings and judgment orders admitted into evidence, no part of the state court proceedings were offered here.

### Miscellaneous

Plaintiff's testimony was sincere, articulate, and corroborated. Debtor's testimony was glib, evasive on cross-examination, and generally uncorroborated. Plaintiff was credible; defendant was not.

Remarks of the Court at the conclusion of trial and factual statements contained in the Conclusion of Law will stand as additional Findings of Fact.

## CONCLUSIONS OF LAW

### Contentions of the Plaintiff

Count II of the Adversary Complaint alleges that the entire debt is non-dischargeable pursuant to 11 U.S.C. § 523(a)(4). Green first contends that the debt is non-dischargeable pursuant to § 523(a)(4) because Debtor committed fraud or defalcation while acting in a fiduciary capacity while he held the original $53,000.00 in trust. He also argues Debtor embezzled funds intended to purchase the original limousines and monies advanced to purchase insurance, and also funds intended for the formation and operation of Midway.

Count I alleges that the entire judgment is non-dischargeable pursuant to 11 U.S.C. 523(a)(2)(A). This contends that all parts of the debt were incurred because of Debtor's false representations. Green argues that the first check for $53,000.00, issued to pay for the limousines, was based upon the false representation that he would be the owner of the limousines. He argues that the representation was false because Debtor and Gurich never purchased the vehicles in his name, and they never intended to do so. Moreover, Green argues that all further payments and investments he made to Debtor and Gurich after the original $53,000.00 were based upon their false representation that they had in fact purchased the two limousines in his name when they showed him the vehicles for his inspection, and that each subsequent advance was the product of that misrepresentation.

### Jurisdiction

This matter is before the Court pursuant to 28 U.S.C. § 157 and is referred under Local District Court Rule 2.33. The Court has subject matter jurisdiction under 28 U.S.C. § 1334, and this is core proceeding under 28 U.S.C. § 157(b)(2)(I).

### Standards for Determining Dischargeability of Debt

■ The issue of dischargeability is a matter of federal law governed by the Bankruptcy Code, Title 11 U.S.C. *Grogan v. Gar-* *ner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). The party seeking to establish an exception to the discharge of debt bears the burden of proof. *In re Martin,* 698 F.2d 883, 887 (7th Cir.1983). Because the policy behind the Bankruptcy Code is to provide a debtor with a fresh start, there is a presumption that a debt is dischargeable. *See In re Zarzynski,* 771 F.2d 304, 306 (7th Cir.1985); *In re Armento,* 127 B.R. 486, 489 (Bankr. S.D.Fla.1991); *In re Carbia,* 113 B.R. 761, 762 (Bankr.S.D.Fla.1990). The burden of proof required for establishing an exception to discharge is a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. at 287, 111 S.Ct. at 659–60. To determine dischargeability of the debt owed to Green, the Court must look separately at each of the checks advanced by plaintiff to determine whether any part or all of the individual debts comprising the total debt of $187,-984.50 are dischargeable.

### Section 523(a)(4) (Count II)

Green contends that the $53,000.00 debt based on his check to purchase the original two limousines, and his subsequent check remitted to obtain insurance for those limousines first arose from fraud or defalcation while Debtor was acting in a fiduciary capacity. Green also contends that Debtor embezzled funds later advanced for the purpose of forming and operating Midway Motors. Section 523(a)(4) provides in part:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

11 U.S.C. § 523(a)(4).

### Fraud or Defalcation While Acting in a Fiduciary Capacity

■ To establish defalcation for purposes of § 523(a)(4), a creditor must show that (1) an express trust existed, (2) the debt was caused by fraud or defalcation, and (3) the debtor acted as a fiduciary to the creditor at the time the debt was created. *Klingman v. Levinson,* 831 F.2d 1292, 1295 (7th Cir.1987); *Johnson v. Woldman,* 158 B.R. 992, 995

(N.D.Ill.1993). The court in *Johnson* observed that the traditional definition of a fiduciary—a relationship involving confidence, trust, and good faith—is far broader than that contemplated by § 523(a)(4): "The fiduciary relationship referred to in § 523(a)(4) has been held to be limited to express and technical trusts, neither of which the law implies from a contract." *Johnson* 158 B.R. at 995 (*citing In re Marchiando*, 142 B.R. 246, 249 (N.D.Ill.1992)).

■■ In *Johnson*, the court considered whether a fiduciary relationship existed under § 523(a)(4) between joint venturers. It was determined that general partners under state law do not occupy the narrowly defined fiduciary relationship expressed in § 523(a)(4). In this case, however, express trusts existed between the parties with respect both to the $53,000.00 check given for the purchase of the first two limousines and the $5,547.00 check to purchase insurance for those vehicles. An express trust is created when a settlor manifests an intent to create such a trust and identifies the subject matter of the trust, the nature of the beneficiaries' interests, and the manner in which the trust is to be performed. *In re Destron, Inc.*, 40 B.R. 927 (Bankr.N.D.Ill.1984) (*citing Limperis v. Material Service Corp.*, 415 F.Supp. 65, 68 (N.D.Ill.1976)). The first express trust in this case was evidenced by the written receipt from Debtor and Gurich for the $53,000.00 check. It is clear that they receipted for monies to be held by them in trust for use in purchasing two limousines for Green with title in his name. They took the $53,000.00 under an acknowledged, express trust to do so. The same is true of the $5,547.00 check given to insure the two limousines, although there was no written acknowledgement. Thus, a fiduciary relationship existed between the parties with respect to those two payments.

■■ Having determined that a fiduciary relationship existed between these parties, the next issue is whether a "defalcation" occurred. Under § 523(a)(4), defalcation is a failure to account for money or property that has been entrusted to another. *In re Iaquinta*, 98 B.R. 919 (Bankr.N.D.Ill.1989); *In re Twitchell*, 72 B.R. 431, 434 (Bankr.D.Utah

1987). An objective standard is used to determine defalcation, with no intent or bad faith needed. *See In re Iaquinta*, 98 B.R. at 923; *In re Gonzales*, 22 B.R. 58, 59 (9th Cir.1982).

> Defalcation under § 523(a)(4) is broader than embezzlement or misappropriation. It can be a mere deficit resulting from the debtor's misconduct, even though he derived no personal gain, and may be through negligence or ignorance rather than misconduct.

*In re Janikowski*, 60 B.R. 784, 789 (Bankr. N.D.Ill.1986) (*citing In re Cowley*, 35 B.R. 526, 529 (Bankr.D.Kan.1983)).

■■ Debtor and Gurich violated the terms of the first trust and bought the two limousines for their own benefit and under title to their businesses. Debtor attempted at trial to introduce evidence of some sort of state requirement that the vehicles be titled in the names of livery businesses like Fantasy and Crest Limousine rather than under Green's name. An unidentified person at the Secretary of State's Office allegedly told him it was required that liveried vehicles be licensed to only livery companies, not to individuals. However, such hearsay testimony was objected to, the objection was sustained, and the evidence was excluded. Defendant failed to produce any admissible evidence supporting his testimony that he could not title the cars in Green's name. He certainly failed to bring in any witness from the Secretary of State's Office or to point to any regulations or statutes supporting his contention. Consequently, his explanation was not supported by the evidence and is found to be a glib attempt to put his misdeeds in a better light.

Debtor further argued that, if there was a trust, the purpose of the trust was carried out because the two vehicles were purchased, and Green's interest in the two limousines was protected as to each limousine because he was shown on the title as a lien holder. Debtor argued that the real purpose of any trust was for purchase of the two cars and for Green to receive net profits from the limousine business.

However, Debtor did not have the unilateral right to modify terms of the express trust by titling the vehicles in the name of anyone other than the purchaser, in the absence of consent by the purchaser. If one discovers he cannot fulfill terms of a trust, it is incumbent upon the trustee to seek permission from the trustor to modify the trust. Debtor failed to do so, and therefore defalcated with Green's money when he bought the limousines in the name of his own company and that of his friend Gurich. He then perpetrated a fraud on Green by misrepresenting that the terms of the trust were satisfied. He did this when he brought the limousines out to show to Green, representing them as Green's cars, not revealing that Green did not own them. A falsehood like that, a knowing falsehood, is a fraudulent act. *In re Janikowski,* 60 B.R. 784, 789 (Bankr. N.D.Ill.1988).

When Debtor and Gurich obtained the $5,547.00 check to buy insurance for the two limousines, it was represented by them that this was the full amount required for that purpose. That check issued by Green was expressly entrusted to them to buy insurance for his two limousines. Green trusted they would pay that amount to an insurance company. Debtor was given ample opportunity to produce documents proving that the full amount was remitted for insurance, but he was not able to do so. Debtor was even allowed to testify to how much he used to purchase insurance. However, he testified that he was not sure how much was actually spent on insurance. From the evidence, it is clear that at best only a quarter of the $5,547.00 was used for insurance. Therefore, three-quarters of the $5,547.00, or $4,160.25, is found to be non-dischargeable pursuant to § 523(a)(4), because there was defalcation of that amount.

Thus, the $53,000.00 debt for the purchase of the limousines plus $4,160.25 of the funds advanced in trust for the purchase of automobile insurance are nondischargeable pursuant to § 523(a)(4) for defalcation of entrusted funds. However, the $53,000.00 portion of this amount must be reduced by the $9,000.00 Green received (through his lawyer) from sale of the white limousine after Debtor released that vehicle to Green's attorney.

### Embezzlement

Green also contends that Debtor embezzled the remaining funds Green advanced for the formation and operation of Midway Motors, giving rise to additional debts that are non-dischargeable under § 523(a)(4). While Green had to show the existence of fiduciary relationships to establish that certain parts of the judgment debts arose from defalcation, the establishment of a fiduciary relationship is not necessary when embezzlement is proven. The words "fiduciary capacity" in § 523(a)(4) only modify "fraud" and "defalcation", not "embezzlement" and "larceny". 3 COLLIER ON BANKRUPTCY, ¶ 523.14, p. 523–102 (15th ed. 1992). A fiduciary or trust relationship need not be established in order to find a debt non-dischargeable by an act of embezzlement. *In re Beasley,* 62 B.R. 653, 654 (Bankr.W.D.Mo. 1986).

> Embezzlement is the fraudulent appropriation of property by a person to whom such property has been entrusted, *or into whose hands it has lawfully come.* It differs from larceny in the fact that the original taking of the property was lawful, or with the consent of the owner, while in larceny the felonious intent must have existed at the time of the taking.

(Emphasis added.) COLLIER, at p. 523–113; *see also In re Weber,* 892 F.2d 534, 538 (7th Cir.1989); *In re Travato,* 145 B.R. 575, 580–581 (Bankr.N.D.Ill.1991); *In re Collins,* No. 93 B 12979, Adv. No. 93 A 01213, 1994 WL 127683 at *5 (Bankr.N.D.Ill., March 31, 1994). To prove embezzlement, the creditor must show: (1) that debtor appropriated funds for his or her own benefit, and (2) that debtor did so with fraudulent intent or deceit. *Weber,* 892 F.2d at 538; *Collins* at *5.

The defendant did in fact embezzle funds advanced by Green for use in Midway Motors. He did so for the benefit of himself and the businesses operated by himself and Gurich. Moreover, the evidence overwhelmingly indicates that Debtor had intent to deceive Green at the time. Debtor and Gurich came into lawful possession of the funds

intended to form Midway Motors. However, all funds tendered by Green to Debtor for the purpose of forming and operating Midway Motors, but which were not actually used for the benefit of Midway Motors, were embezzled. Defendant's debt to plaintiff occasioned thereby is non-dischargeable pursuant to § 523(a)(4).

It must therefore be determined which portions of monies paid by Green for use in the Midway business were not used to benefit Midway. There were 21 checks written on the Midway account. It must be concluded that all checks written to purchase cars from Gaines Service Leasing for Midway, totaling $34,100.00, are the basis for non-dischargeable debt under § 523(a)(4), since those cars did not go to Midway. However, funds spent to purchase the 1986 Cadillac limousine, totaling $29,500.00, that were part of the state court judgment, represents dischargeable debt, as the proceeds received from sale of that car were deposited in the Midway account.

The funds transferred from Midway to Crest and Fantasy, totaling $7,000.00, and expenditures totaling $4,818.18 used to repair cars not owned by Midway, are non-dischargeable pursuant to § 523(a)(4). There has been no evidence that the transfers of funds from Midway to Crest and Fantasy benefited Midway in any way. Debtor thereby embezzled those Midway monies funded by Green. However, it has not been shown by a preponderance of the evidence that the funds spent for salaries to Gurich and Debtor, totaling $4,500.00, were not related to their work on behalf of Midway, so those payments are dischargeable. Moreover, the funds given as consulting fees to Harry Esralew, totaling $3,000.00, are discharged for the same reason. In bankruptcy, there is a presumption in favor of dischargeability. Green did not entirely rebut this presumption and did not show that Midway did not benefit at all from the consulting services of Esralew and work of the two salaried persons. There is a difference between defalcation and embezzlement, which is non-dischargeable, and persuading someone to invest in a poorly run business, which is not.

### Dischargeability of Attorney Fees and Punitive Damages

The state court judgment against Debtor was in the amount of $197,984.50. That court stated "The court further finds that fraud while acting as a fiduciary, embezzlement and larceny are the gist of this action and judgment." Plaintiff's Ex. 9. In Green's prayer for relief, contained in his state court complaint, he sought actual damages totaling $148,247 plus attorney fees and punitive damages. Thus the remaining $49,737.50 awarded was for attorney fees and punitive damages. The Seventh Circuit has held that, when attorney fees are awarded in cases in which the underlying debt is later determined to be non-dischargeable by a bankruptcy court, the attorney fees may also be non-dischargeable. *Klingman v. Levinson*, 831 F.2d 1292, 1296 (7th Cir.1987).

> Ancillary obligations such as attorneys' fees and interest may attach to the primary debt; consequently, their status depends on that of the primary debt.

*Id.* (quoting *In re Hunter*, 771 F.2d 1126, 1131 (8th Cir.1985)). Thus, any attorney fees awarded by the state court which attach to primary debts found non-dischargeable by this Court are also non-dischargeable.

Because it is not clear as to what part awarded by the state court in excess of actual damages was attributable to attorney fees and what part to punitive damages, it is necessary to discuss the dischargeability of punitive damage awards. Under Illinois law, punitive damages "are allowed in the nature of punishment and as a warning and example to deter the defendant and others from committing like offenses in the future." *In re Dvorak*, 118 B.R. 619, 629 (Bankr.N.D.Ill. 1990) (citing *Kelsay v. Motorola, Inc.*, 74 Ill.2d 172, 384 N.E.2d 353 (1978)). There is currently a split of authority, including the bankruptcy judges within this Circuit, as to whether punitive damage awards may be excepted from discharge under 11 U.S.C. § 523. *See In re Dvorak*, 118 B.R. 619 (Bankr.N.D.Ill.1990); *In re Guy*, 101 B.R. 961, 996 (Bankr.N.D.Ind.1988). One line of cases holds that excepting punitive damages from discharge is contrary to the express goal of providing the debtor a fresh start in

bankruptcy and overcompensates the creditor for his injury. *See, e.g., In re Alwan Bros. Co.,* 105 B.R. 886, 890 (Bankr.C.D.Ill. 1989); *In re Schmidt,* 36 B.R. 834, 836–37 (Bankr.D.Minn.1984). Some of these cases reason that excepting punitive damages from discharge under § 523(a) for creditors other than governmental entities is contrary to Congressional intent. *In re Suter,* 59 B.R. 944, 947 (Bankr.N.D.Ill.1986); *Alwan Bros. Co.,* 105 B.R. at 891. The rationale is that in § 523(a)(7) Congress created a specific exception to the discharge of non-compensatory damages only for governmental entities. *Suter,* 59 B.R. at 947. Further, it is said that, if Congress had intended to except other non-compensatory damages from discharge for individuals, it would have done so.

Another line of cases allows punitive damage awards to be excepted from discharge. *See In re Wien,* 155 B.R. 479, 489 (Bankr. N.D.Ill.1993). In bankruptcy, there are goals which Congress has sought to further, such as protecting certain classes of creditors. Among such protected creditors are those whom the debtor has harmed by egregious conduct. *Id.* (*citing In re Britton,* 950 F.2d 602, 606) (9th Cir.1991)). Many cases have held that punitive damage awards for willful and malicious conduct are excepted from discharge under § 523(a)(6). *In re McGuffey,* 145 B.R. 582 (Bankr.N.D.Ill.1992); *Dvorak,* 118 B.R. 619; *In re Miera,* 926 F.2d 741 (8th Cir.1991); *In re Adams,* 761 F.2d 1422 (9th Cir.1985); *Stokes v. Ferris,* 150 B.R. 388 (W.D.Tex.1992), *aff'd,* 995 F.2d 76 (5th Cir.1993).

The latter line of cases emphasizes that it is the nature of the debtor's conduct and not the nature of the liability which determines whether a debt is excepted from discharge pursuant to § 523(a). *Stokes v. Ferris,* 150 B.R. at 393; *see also Miera,* 926 F.2d at 745; *McGuffey,* 145 B.R. at 594. While the "fresh start" is "a central purpose of the [Bankruptcy] Code," this opportunity is limited to the "honest but unfortunate debtor." *Grogan v. Garner,* 498 U.S. 279, 287, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991) (citation omitted).

*In re Guy* reasoned persuasively that

... punitive damages flow from the primary debt just as do attorneys fees and interest, and should not be simply excised from the judgment because this court might feel those damages are too harsh. The entire judgment should either be given collateral estoppel effect, or it should not be given such effect. If the Debtor thought the District Court was erroneous, he should have exercised his appeal rights to that forum.

101 B.R. 961, 996 (Bankr.N.D.Ind.1988).

Courts which have determined that double damages or punitive damages may be included as part of the non-dischargeable debt have correctly held that the word "debt" used in § 523(a) has been defined broadly to include such awards. *In re Patton,* 58 B.R. 149, 151 (Bankr.W.D.N.C.1986). The *Patton* court reasoned as follows:

Section 101(11) of the Bankruptcy Code defines "debt" as a "liability on a claim." Section 101(4) defines this claim as a "right to payment whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."

*In re Patton,* 58 B.R. 149, 151 (W.D.N.C. 1986). The court reviewed the legislative history of the definition of the word "claim," concluding that the plain intent of Congress was to define "claim" as broadly as possible, supporting the conclusion that the word "debt" includes an award of double damages when the underlying debt is found non-dischargeable pursuant to § 523(a)(4) and (6). *See id.*

This Court concludes that Debtor, who has committed both fraud and embezzlement under § 523(a)(2)(A) and (4), is not entitled to discharge any punitive damages or attorney fees assessed by the state court which accompanied the non-dischargeable debt as part of his debt. It cannot be argued that Pawlinski was either an honest or unfortunate debtor. *See In re Wien,* 155 B.R. at 489. Punitive damages are intended to deter egregious conduct, such as the conduct engaged in by Pawlinski, and their addition to his debt is not dischargeable to the extent they relate to debt for damages otherwise found non-dischargeable.

Thus, when a creditor is able to show that awarded attorney fees and punitive damages arise from the same conduct as that creating the non-dischargeable debt, such attorney fees and punitive damages are also non-dischargeable debts. The portion of attorney fees and punitive damages corresponding to the portion of the debt for damages determined non-dischargeable above is also non-dischargeable. Of the state court judgment, $49,737.50 was awarded for attorney fees and punitive damages. Of the actual damages sought by the plaintiff in state court, only $94,078.43 has been held here to be non-dischargeable. Of the attorney fees and punitive damages adjudged in the state court, only $31,583.31 is found to be non-dischargeable.[2]

### Section 523(a)(2) (Count I)

■ Section 523(a)(2) provides as follows: (a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523. To establish that a debt is non-dischargeable pursuant to § 523(a)(2)(A), a creditor must prove that: (1) the debtor obtained the money through representations which debtor either knew to be false or made with such reckless disregard for the truth as to constitute willful misrepresentation; (2) debtor possessed scienter, i.e. an intent to deceive; (3) plaintiff actually relied on the misrepresentations resulting in loss; and (4) plaintiff's reliance was reasonable. *See, e.g., Matter of Scarlata,* 979 F.2d 521, 525 (7th Cir.1992); *In re Kimzey,* 761 F.2d 421, 423–424 (7th Cir.1985); *In re Mayer,* 164 B.R. 83, 84 (N.D.Ill.1994).

■ False representations must concern present or past asserted facts. *In re Bercier,* 934 F.2d 689 (5th Cir.1991). Representations or promises to do future actions do not qualify unless debtor never intended to perform. *Id.; In re Rubin,* 875 F.2d 755 (9th Cir.1989).

■ An intent to deceive may logically be inferred from a false representation which the debtor knows or should know will induce another to advance money to the debtor. *Kimzey,* 761 F.2d at 424; *Federal Trade Commission v. Austin,* 138 B.R. 898, 914 (Bankr.N.D.Ill.1992).

■ "Fraud within the meaning of this section requires proof of positive, intentional misrepresentation or falsehood." *In re Janikowski,* 60 B.R. 784, 789 (Bankr.N.D.Ill. 1986). It is clear that Debtor and Gurich jointly made many knowing and intentional misrepresentations to Green after the first $53,000.00 was advanced. Green relied upon those misrepresentations when he decided to advance additional funds.

First, Debtor misrepresented that Green owned the original two limousines that he and Gurich drove to Green's house for inspection. All subsequent advances resulted from reliance on the truthfulness of that representation, for Green would not have advanced more money if he were told that his original money was used to buy cars for others. It is unnecessary to find, as we do, that Debtor later misrepresented that funds Green advanced for Midway had been used to benefit Midway. Accordingly, the funds associated with the purchase of cars from Gaines Service Leasing that did not go to Midway, totaling $34,100; funds totaling $4,818.18 used to repair cars belonging to other businesses; and funds totaling $7,000.00 transferred from Midway to several other businesses of Debtor and Gurich, are non-dischargeable under § 523(a)(2)(A).

---

**2.** This amount is calculated as follows: The dischargeable portion of the debt is $54,168.57 (actual damages of $148,247.00 less $94,078.43 of damages found non-dischargeable), which constitutes 36.5% of the actual damages ($148,247.00) awarded by the state court. Thus 36.5% of the attorney fees and punitive damages awarded ($49,737.50), or $18,154.19, is the dischargeable portion of the attorney fee and punitive damage award. This leaves $31,583.31 non-dischargeable.

Debtor and Gurich further jointly misrepresented that they knew the used car business, as part of their con job to persuade Green that it was a good market and that Green could make good money. However, Debtor acknowledged that he had no knowledge concerning the used limousine business. The facts of this case amply demonstrate that Debtor and Gurich lacked sophistication in the business of reselling limousines because they bought only one used limousine for $29,500.00 and resold it immediately for a net of $28,492.03.

Debtor and Gurich also misrepresented that they would each invest $300,000.00 into the Midway business. This was just another deception, because Debtor knew that he lacked the funds or credit to make such any investment, and of course he never did so.

Green relied on the many representations made by Gurich and Debtor. Given his gullibility, friendliness, physical disability, and lack of sophistication in business affairs, his reliance upon their representations was reasonable. He was greatly injured by his misplaced reliance on repeated misrepresentations.

■ The $53,000 advanced by Green to purchase the limousines does not satisfy the requirements of § 523(a)(2)(A), although it is still non-dischargeable pursuant to § 523(a)(4). It was not shown by a preponderance of the evidence that Debtor did not intend to keep his promise to purchase the limousines for Green at the time the promise was made. *See In re Rubin,* 875 F.2d 755 (9th Cir.1989) (representations or promises to do future actions do not qualify as a misrepresentation unless debtor never intended to perform). It is just barely possible that Debtor did then intend to keep his undertaking to buy the limousines in Green's name at the time he accepted the $53,000.00 check. It was later that he violated the terms of that undertaking.

For the same reason, the money entrusted to buy insurance on the limousines does not satisfy the requirements of § 523(a)(2)(A), although the debt is still held non-dischargeable pursuant to § 523(a)(4). Although Debtor's conduct is viewed with suspicion, it was not shown by a preponderance of evidence that Debtor did not intend to purchase insurance at the time he received the check from Green for insurance. He and Gurich did in fact purchase some insurance on Green's case, defalcating as to the remainder of that fund.

### Debtor's Request for New Judgment

In Plaintiff's prayer for relief, he has sought entry of a money judgment in his favor against Debtor Pawlinski. However, a judgment has already been entered, liquidating the debt by judgment in the Circuit Court of Cook County, Illinois, in Case No. 88 CH 4905. Judgment there was entered for Green in the amount of $197,984.50. Thus, this Court is limited to determining the dischargeability of the debt already adjudicated by the state court. For reasons of *res judicata,* a new money judgment here is not appropriate, necessary, or proper.

### CONCLUSIONS

For the above-stated reasons, the debt arising from initial purchase of the two limousines in the amount of $53,000.00 is found non-dischargeable pursuant to § 523(a)(4). In addition, the following debts are also found non-dischargeable pursuant to § 523(a)(4) in Count II:

| | |
|---|---|
| (1) funds advanced for insurance | $ 4,160.25 |
| (2) funds associated with cars purchased from Gaines Service Leasing | $34,100.00 |
| (3) funds transferred to Crest/Fantasy | $ 7,000.00 |
| (4) funds advanced for the formation of Midway Motors used to repair other cars | $ 4,818.18 |

Therefore, in Count II, the debts listed above owed from Debtor to Green, totaling $103,078.43, are found non-dischargeable pursuant to § 523(a)(4). Against that amount, however, Debtor is credited $9,000.00 for the proceeds from sale of the limousine, ultimately turned over to Green's lawyer on Green's behalf. Thus, $94,078.43 in damages is found non-dischargeable pursuant to § 523(a)(4), plus $31,583.31 was added to the state court judgment for fees and punitive damages relating to this portion of the damages.

The same portions of debt are also found non-dischargeable under Count I pursuant to

§ 523(a)(2)(A), with the exception of the $53,000.00 first advanced by Green for the purchase of the limousines. All subsequent advances and investments flowed from the initial lie that the two limousine driven to Green's home belonged to him. Since the amount of non-dischargeable damages in Count I is only $36,918.18, the proportionate amount of fees and punitive damages awarded by the state court with respect to this part of the damages is only $12,434.37, for a total judgment of $49,352.55.

Finally, the debt to Green is non-dischargeable as to post-judgment interest on that portion of the state court judgment determined herein to be non-dischargeable, at the rate of statutory interest determined under Illinois law from the date the state court judgment was entered until the date that the non-dischargeable portion thereof is paid. All other relief sought by plaintiff Harry Green, Jr. is denied.

This Opinion constitutes the Court's Findings of Fact and Conclusions of Law in accord with Fed.R.Bankr.P. 7052. A separate judgment in accord therewith is being entered contemporaneously.