In re Stuart M. HANSON, d/b/a
Hanson & White, LLC,
Debtor.

Michael Deady, Plaintiff,

v.

Stuart M. Hanson, individually,
and Hanson & White,
LLC, Defendants.

Bankruptcy No. 09 B 04820.
Adversary No. 09 A 00457.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

July 13, 2010.

William P. Suriano, Esq., Riverside, IL, for Plaintiff.

Robert R. Benjamin Esq. & John M. Brom, Esq., Chicago, IL, for Debtor/Defendant.

Gina B. Krol, Esq., for Trustee.

### MEMORANDUM OPINION

JOHN H. SQUIRES, Bankruptcy Judge.

This matter comes before the Court on the complaint seeking an exception to the discharge of certain debts pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (a)(4), which was filed by Michael Deady against the debtor, Stuart M. Hanson and his company, Hanson & White, LLC. For the reasons set forth herein, the Court finds that the Creditor has demonstrated that the loans he made for $350,000 and $49,000 (less the $9,000 repayment) are non-dischargeable debts under § 523(a)(2)(A). However, the Creditor has failed to show that the additional $15,635.19 debt is non-dischargeable under § 523(a)(2)(A). Further, the Creditor has failed to demonstrate that any of the debts are non-dischargeable under § 523(a)(4).

### I. *JURISDICTION AND PROCEDURE*

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. It is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (I), and (O).

### II. *FACTS AND BACKGROUND*

■ Most of the facts in this matter are not in dispute. The plaintiff, Michael Deady (the "Creditor"), is the owner of an Illinois corporation named Deady Roofing and Construction, Inc. ("Deady Roofing"). According to the Creditor, Deady Roofing provides roofs for commercial and residential real property. The Creditor testified that he has been in the roofing business since 1985. Stuart Hanson (the "Debtor") was a member and the manager of Hanson & White, LLC ("H & W"), an Illinois limited liability company that was in the business of building custom and "spec" homes in the suburbs of Chicago.[1] The Debtor was involved in the day-to-day operations of H & W and in the dealings between Deady Roofing and H & W.

In 2005, H & W hired Deady Roofing to provide labor and materials for several construction projects on which H & W was the general contractor. In late 2006, the Creditor and the Debtor discussed the prospect of the Creditor's financial involvement in H & W's construction projects. The Creditor suggested that he become involved with a project that H & W was completing on Colfax Street in Clarendon Hills, Illinois. The Debtor informed the Creditor, however, that the project was almost completed and that H & W was not interested in and had no need for the Creditor's financial participation.

On October 27, 2006, the parties met to discuss the Creditor's participation in other H & W construction projects. The Creditor and the Debtor discussed a project located at 262 South Prospect in Clarendon Hills (the "262 South Prospect Project"). The project involved the construction of a high-end custom home. The Debtor made notes regarding this meeting. (Creditor Ex. No. 3; Debtor

---

1. The Court notes that the Creditor did not file an executed certificate of service to show proper service of the summons and complaint on H & W, the other defendant in this adversary proceeding. Moreover, H & W, a limited liability company, cannot receive a discharge. *See* 11 U.S.C. § 727(a)(1). Hence, the Court will not address the allegations in the complaint as they pertain to H & W.

Ex. No. 3.) The notes reveal that the parties discussed the 262 South Prospect Project and indicate that a $250,000 to $350,000 sum was mentioned. (*Id.*) According to the notes, the Debtor and the Creditor also discussed other H & W projects during the meeting. (*Id.*) These construction projects were located at Colfax and Ruby Streets in Clarendon Hills. (*Id.*) However, no specific sum of money was referenced in the Debtor's notes with respect to these other projects. (*Id.*) Rather, question marks were placed next to the notes on the Colfax and Ruby projects. (*Id.*)

At or about the same time as the October 2006 meeting, the Debtor told the Creditor that he was in the process of forming a new entity to be known as HW Development LLC ("HW Development"). According to the Debtor, at some point in the future, the Creditor would have the option of converting his financial participation into some form of membership interest in HW Development. HW Development, however, was never formed.

After the October 27, 2006 meeting, the Creditor agreed to loan H & W $350,000. According to the Creditor, he and the Debtor agreed that these funds would be used solely for the 262 South Prospect Project. The Creditor testified that he and the Debtor did not discuss using this money for any other project. The Creditor also testified that he would not have loaned the money to the Debtor if he knew that the funds would be used for projects other than the 262 South Prospect Project. The Debtor disputes the Creditor's contention that all the funds were to be utilized solely for the 262 South Prospect Project. The Debtor testified that he told the Creditor that some of the monies would be invested in the 262 South Prospect Project and some of the funds would be invested in other ongoing H & W projects. The use of the funds is one of the few contested facts and the key dispute in this matter.

The Creditor provided the $350,000 to H & W in three installments: (1) $100,000 on November 15, 2006; (2) $150,000 on December 18, 2006; and (3) $100,000 on January 18, 2007. (Creditor Ex. No. 13 at pp. 1–3; Debtor Ex. No. 13 at pp. 1–3.) These checks were deposited into H & W's operating account as they were received.

At the time the Creditor gave H & W the last check, the Debtor provided the Creditor with two documents. The first document was a promissory note dated January 13, 2007 for $350,000 that had been signed by the Debtor as the managing member of H & W. (Creditor Ex. No. 4; Debtor Ex. No. 4.) The note stated that the principal amount of "$350,000, plus 20% of the net project profit on underlying investment projects; relating to the construction project specified, and as defined, in the Venture Agreement [discussed *infra*] ..., shall be due and payable on the day of closing of the sale of the single-family residence specified in the Venture Agreement...." (*Id.*) Under the terms of the promissory note, H & W was obligated to repay the Creditor $350,000 and any other amounts that had accrued by or before December 31, 2008. (*Id.*) While the promissory note was in effect, H & W was also required to provide the Creditor with periodic updates and business reviews, including financial documentation as requested. It is undisputed that the Debtor did not provide the Creditor with any of the financial documentation that was requested.

The second document that the Debtor provided to the Creditor was a venture agreement (the "Venture Agreement") dated January 13, 2007. (Creditor Ex. No. 2; Debtor Ex. No. 2.) This document governed the agreement between the parties regarding the acquisition and development

of real estate. Specifically, the Venture Agreement provided that the $350,000 given by the Creditor would "be used to acquire and enhance real estate projects as discussed." (*Id.*) The Venture Agreement also addressed how the Creditor's $350,000 could be converted into a membership interest in HW Development, which had not yet been formed. (*Id.*) Until this new entity was formed, the promissory note would remain in effect. The Venture Agreement defined the term "net project profit" as used in the promissory note to mean "all gross profits and receipts derived by H & W in conjunction with the Construction Projects, less usual and customary costs and expenses incurred and paid in the construction and sale of the aforesaid single-family residence . . . ." (*Id.*) The Venture Agreement did not define the terms "Construction Projects" or "aforesaid single-family residence."

In January 2008, the Debtor told the Creditor that H & W did not have enough funds to complete the 262 South Prospect Project. The Creditor testified that he questioned the Debtor regarding the $350,000 he loaned to H & W. According to the Creditor, the Debtor assured him that those monies went into the 262 South Prospect Project. Again, the Debtor disputes that the funds were used solely for that Project. The Creditor further testified that he asked the Debtor to provide him with the checking account records of H & W but stated that he never received those records until after he filed the instant adversary proceeding. Even though he did not obtain any H & W records, the Creditor loaned H & W additional funds totaling $49,000. Those funds were distributed to H & W as follows: (1) $22,000 on January 22, 2008; (2) $13,500 on March 7, 2008; (3) $5,500 on April 3, 2008; and (4) $8,000 on April 3, 2008. (Creditor Ex. No. 13 at pp. 4–7; Debtor Ex. No. 13 at pp. 4–7.) After the last monies were

turned over to H & W, the Debtor gave the Creditor a second promissory note in the sum of $49,000. (Creditor Ex. No. 5; Debtor Ex. No. 5.) This note was dated April 4, 2008 and had a maturity date of March 31, 2009. (*Id.*) It was entitled "PROMISSORY NOTE–Operating Capital." (*Id.*) The Debtor signed the document as managing member of H & W and personally guaranteed the promissory note. (*Id.*) The Creditor contends that he did not receive the signed note until July 2008. (Creditor Ex. Nos. 14 & 15; Debtor Ex. Nos. 14 & 15.)

On April 4, 2008, the Debtor sent the Creditor two e-mail messages. (Creditor Ex. No. 14; Debtor Ex. No. 14.) In the first message, the Debtor thanked the Creditor for his "continued support for our business." (*Id.*) He then went on to discuss the 262 South Prospect Project and the remaining items that were unpaid on that Project. (*Id.*) In another message later that day, the Debtor attached a copy of the promissory note "for the $49,000 operating capital you have contributed this year to keep our business afloat." (*Id.*)

Subsequently, on May 20, 2008, the Debtor sent the Creditor an e-mail message wherein he discussed the $49,000 promissory note and an agenda for a future meeting. (Creditor Ex. No. 15; Debtor Ex. No. 15.) One item that the Debtor listed as a topic of discussion was "the project you funded at 262 [South] Prospect." (*Id.*) The Debtor proposed the possibility of selling the real property at 262 South Prospect and noted that such action would "make it a drawn out process for paying you back your significant investment in this project." (*Id.*) He further noted that "[w]e would basically end up having a long term debt to you which [H & W] would repay over time with proceeds from other projects." (*Id.*) The e-mail message also mentioned the idea of the

Creditor taking ownership of the 262 South Prospect property because "all of the equity in the project was provided by you and Lori [ (the Creditor's wife) ]." (*Id.*)

Thereafter, on May 27, 2008, the Debtor sent the Creditor another e-mail message stating that he wanted to discuss "our options with [262 South] Prospect...." (Creditor Ex. No. 16; Debtor Ex. No. 16.) According to the Debtor, some of the options would "mean that your money from this project would be tied up longer than anyone wants." (*Id.*)

On June 16, 2008, the Debtor once again informed the Creditor that H & W lacked the funds to complete the 262 South Prospect Project and that additional monies were needed to purchase appliances. As a result, the Creditor loaned H & W $15,635.19 so that H & W could purchase appliances for the 262 South Prospect Project. (Creditor Ex. No. 13 at p. 8; Debtor Ex. No. 13 at p. 8.) H & W spent more than $350,000 on the 262 South Prospect Project. (Creditor Ex. No. 8; Debtor Ex. No. 8.) H & W sold the 262 South Prospect property on April 9, 2009 for the sum of $1,100,000. (Creditor Ex. No. 18; Debtor Ex. No. 18.)

The Creditor did not retain or consult with an attorney to assist him in his dealings with the Debtor and H & W. The Creditor testified that he had invested in real estate before investing with the Debtor and H & W. Further, he admitted that he did not have any reservations about investing in "spec" homes. The Creditor testified that he did not review any financial information about H & W prior to loaning the $350,000. He did, however, request such information prior to making the $49,000 loan. The Creditor loaned H & W the funds even though he never received the requested financial data.

H & W has not repaid the Creditor any money on the $350,000 promissory note. The Creditor received $9,000 on the $49,000 promissory note that the Debtor personally guaranteed. H & W did not repay the Creditor the $15,635.19 he loaned the company for the purchase of the appliances for the 262 South Prospect property.

On June 5, 2009, the Creditor filed a five-count complaint against the Debtor and H & W. In Counts I and II of the complaint, the Creditor alleges that the Debtor made a false representation and used deceit to cheat him out of the loan proceeds. Specifically, the Creditor claims that the Debtor falsely represented to him that the funds he lent to H & W would be used for only three projects.[2]

---

**2.** The complaint alleges that the $350,000 loan proceeds were to be used for only three projects. However, at trial and in his post-trial submissions, the Creditor contends that all of the monies ($350,000, $49,000, and $15,635.19) loaned to the Debtor were to be used for only the 262 South Prospect Project. The Debtor takes issue with these inconsistencies.

Federal Rule of Bankruptcy Procedure 7015, which incorporates Federal Rule of Civil Procedure 15, governs amendment of pleadings. " '[T]he Federal Rules of Civil Procedure create [a system] in which the complaint does not fix the plaintiff's rights but may be amended at any time to conform to the evidence.' " *Winger v. Winger,* 82 F.3d 140, 144 (7th Cir.1996) (*quoting Duckworth v. Franzen,* 780 F.2d 645, 649 (7th Cir.1985)). Rule 15(b)(2) provides in pertinent part that "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." Fed.R.Civ.P. 15(b)(2). In determining whether there was implied consent, a court must determine "whether the opposing party had a fair opportunity to defend and whether he could have presented additional evidence had he known sooner the substance of the amendment." *In re Rivinius, Inc.,* 977 F.2d 1171, 1175 (7th Cir.1992) (internal quotation omitted).

Further, the Creditor contends that the Debtor falsely represented to him that he would either be repaid by December 31, 2008 or receive an interest in HW Development. Additionally, the Creditor alleges that these representations were made with the intent to deceive him and that he justifiably relied on the Debtor's misrepresentations when he lent H & W money. Accordingly, the Creditor maintains that the debts are non-dischargeable under 11 U.S.C. § 523(a)(2)(A). Pursuant to Counts III and IV of the complaint, the Creditor contends that the debts arise from the Debtor's defalcation while acting in a fiduciary capacity and that the Debtor's actions constitute embezzlement. Thus, the Creditor seeks a finding that the debts be excepted from discharge under 11 U.S.C. § 523(a)(4).

The Debtor filed an answer to the complaint wherein he denied the material allegations contained in the complaint. In addition, the Debtor asserted two affirmative defenses: (1) the complaint is based upon the Venture Agreement and promissory notes between the Creditor and H & W, and, thus, the complaint fails to state a claim upon which relief can be granted against the Debtor; and (2) the Debtor reserves the right to assert any other claims or defenses as may become available.

On March 12, 2010, the Court held an evidentiary hearing in this matter. The Creditor moved for a judgment on partial findings pursuant to Federal Rule of Civil Procedure 52 and its bankruptcy analog Federal Rule of Bankruptcy Procedure 7052. Pursuant to Bankruptcy Rule 7052(c), the Court reserved ruling on the motion until the close of all the evidence. Thereafter, the Court took the matter under advisement. The Court grants the Creditor's motion in part because he has proven all of the requisite elements under § 523(a)(2)(A) with respect to the $350,000 and $49,000 debts, but has not demonstrated all of the elements pursuant to § 523(a)(4) as discussed *infra.*

## III. *APPLICABLE STANDARDS*

### A. Exceptions to the Discharge of a Debt

The discharge provided by the Bankruptcy Code is meant to effectuate the "fresh start" goal of bankruptcy relief. *Vill. of San Jose v. McWilliams*, 284 F.3d 785, 790 (7th Cir.2002). The party seeking to establish an exception to the discharge of a debt bears the burden of proof. *Goldberg Secs., Inc. v. Scarlata (In re Scarlata)*, 979 F.2d 521, 524 (7th Cir.1992); *Banner Oil Co. v. Bryson (In re Bryson)*, 187 B.R. 939, 957 (Bankr.N.D.Ill.1995). The United States Supreme Court has held that the burden of proof required to establish an exception to discharge is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). *See also In re McFarland*, 84 F.3d 943, 946 (7th Cir. 1996); *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir.1994). Exceptions to discharge are to be construed strictly against a creditor and liberally in favor of a debtor. *In*

In this matter, the Court finds that the issue of whether all of the Creditor's monies ($350,000, $49,000 and $15,635.19) would be used solely for the 262 South Prospect Project was tried by implied consent. The Debtor had a full and fair opportunity to defend against the allegations. He testified that he and the Creditor discussed more than one project for the Creditor's investment, and he denied that the Creditor's monies were be to used solely for the 262 South Prospect Project. Accordingly, the Court will treat this issue as if it had been raised in the pleadings. Because the issue was tried by implied consent, formal amendment of the Creditor's complaint is not necessary. *See Winger*, 82 F.3d at 144; *Burdett v. Miller*, 957 F.2d 1375, 1380 (7th Cir. 1992).

*re Morris,* 223 F.3d 548, 552 (7th Cir. 2000); *Kolodziej v. Reines (In re Reines),* 142 F.3d 970, 972–73 (7th Cir.1998); *In re Zarzynski,* 771 F.2d 304, 306 (7th Cir. 1985). "[Section 523(a)] is narrowly construed so as not to undermine the Code's purpose of giving the honest but unfortunate debtor a fresh start." *Park Nat'l Bank & Trust of Chi. v. Paul (In re Paul),* 266 B.R. 686, 693 (Bankr.N.D.Ill.2001).

### B. 11 U.S.C. § 523(a)(2)(A)

Section 523 of the Bankruptcy Code enumerates specific, limited exceptions to the dischargeability of debts. Section 523(a)(2)(A) provides as follows:

(a) A discharge under section 727 ... does not discharge an individual debtor from any debt—

. . .

▮ (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

11 U.S.C. § 523(a)(2)(A). Section 523(a)(2)(A) lists three separate grounds for dischargeability: actual fraud, false pretenses, and a false representation. *Id.; Bletnitsky v. Jairath (In re Jairath),* 259 B.R. 308, 314 (Bankr.N.D.Ill.2001).

### 1. False Pretenses or False Representation

▮ In order to except a debt from discharge under the false pretenses or false representation prongs of § 523(a)(2)(A), the creditor must establish the following elements: (1) the debtor made a false representation of fact; (2) which the debtor (a) either knew to be false or made with reckless disregard for its truth and (b) made with an intent to deceive; and (3) the creditor justifiably relied on the false representation. *Ojeda v. Goldberg,* 599 F.3d 712, 716–17 (7th Cir.2010); *Baker Dev. Corp. v. Mulder (In re Mulder),* 307 B.R. 637, 643 (Bankr. N.D.Ill.2004); *Bednarsz v. Brzakala (In re Brzakala),* 305 B.R. 705, 710 (Bankr. N.D.Ill.2004). To prevail on a § 523(a)(2)(A) complaint, all three elements must be established. *Glucona Am., Inc. v. Ardisson (In re Ardisson),* 272 B.R. 346, 357 (Bankr.N.D.Ill.2001). Failure to establish any one fact is outcome determinative. *Jairath,* 259 B.R. at 314.

▮ False pretenses in the context of § 523(a)(2)(A) include implied misrepresentations or conduct intended to create or foster a false impression. *Mem'l Hosp. v. Sarama (In re Sarama),* 192 B.R. 922, 927 (Bankr.N.D.Ill.1996). The Court has defined false pretenses as follows:

[A] series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or false and misleading understanding of a transaction, in which a creditor is wrongfully induced by the debtor to transfer property or extend credit to the debtor....

A false pretense is usually, but not always, the product of multiple events, acts or representations undertaken by a debtor which purposely create a contrived and misleading understanding of a transaction that, in turn, wrongfully induces the creditor to extend credit to the debtor. A "false pretense" is established or fostered willfully, knowingly and by design; it is not the result of inadvertence.

*Sterna v. Paneras (In re Paneras),* 195 B.R. 395, 406 (Bankr.N.D.Ill.1996) (internal quotation omitted).

False pretenses do not necessarily require overt misrepresentations. *Sarama*, 192 B.R. at 928. "Instead, omissions or a failure to disclose on the part of a debtor can constitute misrepresentations where the circumstances are such that omissions or failure to disclose create a false impression which is known by the debtor." *Id.* Silence or concealment may constitute false pretenses. *Shelby Shore Drugs, Inc. v. Sielschott (In re Sielschott),* 332 B.R. 570, 573 (Bankr.C.D.Ill.2005); *Fosco v. Fosco (In re Fosco),* 289 B.R. 78, 86 (Bankr.N.D.Ill.2002).

A false representation can be shown through conduct and does not require a spoken or written statement. *Jairath,* 259 B.R. at 314. In other words, "[a] debtor's silence regarding a material fact can constitute a false representation under § 523(a)(2)(A)." *Health Benefit Plan v. Westfall (In re Westfall),* 379 B.R. 798, 803 (Bankr.C.D.Ill.2007). A debtor's failure to disclose pertinent information may be a false representation where the circumstances imply a specific set of facts and disclosure is necessary to correct what would otherwise be a false impression. *Trizna & Lepri v. Malcolm (In re Malcolm),* 145 B.R. 259, 263 (Bankr.N.D.Ill. 1992).

### 2. Actual Fraud

The Seventh Circuit Court of Appeals has defined the term "fraud" for purposes of § 523(a)(2)(A) as follows:

'Fraud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated.' *McClellan v. Cantrell,* 217 F.3d 890, 893 (7th Cir.2000) (*quoting Stapleton v. Holt,* 207 Okla. 443, 250 P.2d 451, 453–54 (1952)). "Actual fraud" is not limited to misrepresentation, but may encompass "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another[.]" *Id.* (internal quotation omitted). Hence, a different analysis from misrepresentation must be utilized when a creditor alleges actual fraud. *Id.* The *McClellan* court opined that because common law fraud does not always take the form of a misrepresentation, a creditor need not allege misrepresentation and reliance thereon to state a cause of action for actual fraud under § 523(a)(2)(A). *Id.* Rather, the creditor must establish the following: (1) a fraud occurred; (2) the debtor intended to defraud the creditor; and (3) the fraud created the debt that is the subject of the discharge dispute. *Id.* at 894. The fraud exception under § 523(a)(2)(A) does not reach constructive frauds, only actual ones. *Id.* The existence of fraud may be inferred if the totality of the circumstances presents a picture of deceptive conduct by the debtor that indicates he intended to deceive or cheat the creditor. *Cripe v. Mathis (In re Mathis),* 360 B.R. 662, 666 (Bankr.C.D.Ill.2006); *Sielschott,* 332 B.R. at 572.

### 3. Intent

Any cause of action under § 523(a)(2)(A)—false pretenses, false representation, or actual fraud—requires proof that the debtor acted with intent to deceive. *Pearson v. Howard (In re Howard),* 339 B.R. 913, 919 (Bankr.N.D.Ill. 2006). Proof of intent to deceive is measured by the debtor's subjective intention at the time the representation was made. *Mega Marts, Inc. v. Trevisan (In re Trevi-*

*san)*, 300 B.R. 708, 717 (Bankr.E.D.Wis. 2003); *see also CFC Wireforms, Inc. v. Monroe (In re Monroe)*, 304 B.R. 349, 356 (Bankr.N.D.Ill.2004). Therefore, subsequent acts of fraud or omission do not demonstrate that the debtor had the requisite intent at the time the representations were made. *Trevisan*, 300 B.R. at 717. "Where a person knowingly or recklessly makes false representations which the person knows or should know will induce another to act, the finder of fact may logically infer an intent to deceive." *Jairath*, 259 B.R. at 315. Because direct proof of fraudulent intent is often unavailable, fraudulent intent may be inferred from the surrounding circumstances. *Hickory Point Bank & Trust, FSB v. Kucera (In re Kucera)*, 373 B.R. 878, 884 (Bankr.C.D.Ill. 2007); *Rezin v. Barr (In re Barr)*, 194 B.R. 1009, 1020 (Bankr.N.D.Ill.1996). The determination of intent is a question of fact to be decided by the bankruptcy court. *Howard*, 339 B.R. at 919.

### 4. Justifiable Reliance

■■■■■ The final element under § 523(a)(2)(A) requires a finding of causation. Reliance on a false pretense, a false representation, or actual fraud under § 523(a)(2)(A) must be "justifiable." *Field v. Mans*, 516 U.S. 59, 74–75, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). Justifiable reliance is a less demanding standard than reasonable reliance and requires only that the creditor did not "blindly [rely] upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Id.* at 71, 116 S.Ct. 437 (internal quotation omitted). Justifiable reliance is an intermediate level of reliance that falls somewhere between the more stringent "reasonable reliance" guidepost and the more lenient "reliance in fact." *Id.* at 74–75, 116 S.Ct. 437.

■■■■■ The justifiable reliance standard imposes no duty to investigate unless the falsity of the representation is readily apparent. *Id.* at 70–72, 116 S.Ct. 437. Whether a party justifiably relies on a misrepresentation is determined by looking at the circumstances of a particular case and the characteristics of a particular plaintiff, not by an objective standard. *Id.* at 71, 116 S.Ct. 437; *Bombardier Capital, Inc. v. Dobek (In re Dobek)*, 278 B.R. 496, 508 (Bankr.N.D.Ill.2002). "[A] person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'" *Mercantile Bank v. Canovas*, 237 B.R. 423, 429 (Bankr. N.D.Ill.1998) (*quoting Field*, 516 U.S. at 70, 116 S.Ct. 437). "However, a 'plaintiff may not bury his head in the sand and willfully ignore obvious falsehoods.'" *Johnston v. Campbell (In re Campbell)*, 372 B.R. 886, 892 (Bankr.C.D.Ill.2007) (*quoting Zirkel v. Tomlinson (In re Tomlinson)*, Ch. 7 Case No. 96 B 27172, Adv. No. 96 A 1539, 1999 WL 294879, at \*12 (Bankr. N.D.Ill. May 10, 1999)).

■■■■■ To satisfy the reliance element of § 523(a)(2)(A), the creditor must show that the debtor made a material misrepresentation that was the cause-in-fact of the debt that the creditor wants excepted from discharge. *Mayer v. Spanel Int'l Ltd. (In re Mayer)*, 51 F.3d 670, 676 (7th Cir.1995) ("Reliance means the conjunction of a material misrepresentation with causation in fact."). *See also Westfall*, 379 B.R. at 805 (*citing Mayer*).

### C. 11 U.S.C. § 523(a)(4)

■■■■■ Section 523(a)(4) of the Bankruptcy Code provides that a debtor cannot discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny[.]" 11 U.S.C. § 523(a)(4). The meaning of these terms

is a question of federal law. *In re McGee*, 353 F.3d 537, 540 (7th Cir.2003). In order for a creditor to prevail under § 523(a)(4), he must prove that a debtor committed (1) fraud or defalcation while acting as a fiduciary; or (2) embezzlement; or (3) larceny. 11 U.S.C. § 523(a)(4). Count III of the Creditor's complaint alleges that the debts at issue are based on the Debtor's defalcation while acting as a fiduciary. Count IV of the complaint alleges that the Debtor fraudulently appropriated or embezzled the loan proceeds entrusted to him by the Creditor by using those funds for unauthorized purposes. The Creditor does not allege larceny. Thus, the Court will not discuss the larceny prong of tortious conduct proscribed under § 523(a)(4).

### 1. Express Trust or Fiduciary Relationship

A threshold inquiry is whether an express trust or a fiduciary relationship runs from the Debtor to the Creditor under the facts of this matter. The existence of an express trust or fiduciary relationship is tested under federal law standards. *O'Shea v. Frain (In re Frain)*, 230 F.3d 1014, 1017 (7th Cir.2000). An express trust requires an explicit declaration of trust, a clearly defined trust res, and an intent to create a trust. *Monroe*, 304 B.R. at 358. The intent to create a trust relationship is a key element in determining the existence of an express trust. *Id.*

A § 523(a)(4) cause of action can be based on a fiduciary relationship other than one arising from an express trust. *See Frain*, 230 F.3d at 1017; *In re Marchiando*, 13 F.3d 1111, 1115–16 (7th Cir.1994). "A fiduciary relationship may arise separate from an express trust, ... but it is the substance and character of the debt relationship that determines whether such a fiduciary relationship exists." *Monroe*, 304 B.R. at 358. The Seventh Circuit has found that a fiduciary relationship exists for purposes of § 523(a)(4) when there is "a difference in knowledge or power between fiduciary and principal which ... gives the former a position of ascendancy over the latter." *Marchiando*, 13 F.3d at 1116; *see also In re Woldman*, 92 F.3d 546, 547 (7th Cir.1996) ("[S]ection 523(a)(4) reaches only those fiduciary obligations in which there is substantial inequality in power or knowledge....."). For example, a lawyer-client relationship, a director-shareholder relationship, and a managing partner-limited partner relationship all require the principal to " 'repose a special confidence in the fiduciary.' " *Frain*, 230 F.3d at 1017 (*quoting Marchiando*, 13 F.3d at 1116). However, not all fiduciary relationships fall within the purview of § 523(a)(4). *Woldman*, 92 F.3d at 547. A fiduciary relationship qualifies under § 523(a)(4) only if it "imposes real duties in advance of the breach...." *Marchiando*, 13 F.3d at 1116. In other words, the fiduciary's obligation must exist prior to the alleged wrongdoing. *Id.*

### 2. Fraud or Defalcation

"Fraud" for purposes of this exception has generally been interpreted as involving intentional deceit, rather than implied or constructive fraud. *Mut. Mgmt. Servs., Inc. v. Fairgrieves (In re Fairgrieves)*, 426 B.R. 748, 754 (Bankr. N.D.Ill.2010). "Defalcation" is not a defined term in the Bankruptcy Code. One court has defined defalcation within the context of § 523(a)(4) as "the misappropriation of trust funds held in any fiduciary capacity, and the failure to properly account for such funds." *Strube Celery & Vegetable Co., Inc. v. Zois (In re Zois)*, 201 B.R. 501, 506 (Bankr.N.D.Ill.1996) (internal quotation omitted); *see also Blackhawk B.M.X., Inc. v. Anderson (In re Anderson)*, 64 B.R. 331, 334 (Bankr.

N.D.Ill.1986). Defalcation has also been defined as "a failure to account for money or property that has been entrusted to another." *Green v. Pawlinski (In re Pawlinski)*, 170 B.R. 380, 389 (Bankr. N.D.Ill.1994). An objective standard is used to determine defalcation, and intent or bad faith is not required. *Id.* Mere negligence does not constitute defalcation. *Meyer v. Rigdon*, 36 F.3d 1375, 1382–85 (7th Cir.1994) (construing defalcation under §§ 523(a)(4) and 523(a)(11)). That is, although the Seventh Circuit has not clearly defined the level of tortious conduct necessary to constitute defalcation in the context of § 523(a)(4), it has required something more than mere negligence or mistake, but less than fraud. *Id.* at 1385; *Kress v. Kusmierek (In re Kusmierek)*, 224 B.R. 651, 656–57 (Bankr.N.D.Ill.1998). Some degree of culpability is required to make a debt non-dischargeable as defalcation under § 523(a)(4), *see Cent. Hanover Bank & Trust Co. v. Herbst*, 93 F.2d 510, 511–12 (2d Cir.1937), and a debtor's knowledge is relevant, *see Chase Lumber & Fuel Co. v. Koch (In re Koch)*, 197 B.R. 654, 658–59 (Bankr.W.D.Wis.1996). In sum, in order to establish that a debt is non-dischargeable for reason of fraud or defalcation while acting in a fiduciary capacity, the creditor must establish, by a preponderance of the evidence, the existence of an express trust or a fiduciary relationship and a debt caused by the debtor's fraud or defalcation. *Grogan*, 498 U.S. at 291, 111 S.Ct. 654; *Woldman*, 92 F.3d at 547.

**3. Embezzlement**

Embezzlement under § 523(a)(4) has been defined as the " 'fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come.' " *In re Weber*, 892 F.2d 534, 538 (7th Cir.1989) (*quoting Moore v. Unit-*

*ed States*, 160 U.S. 268, 269, 16 S.Ct. 294, 40 L.Ed. 422 (1895)). To prove embezzlement, the creditor must show: (1) the debtor appropriated the subject funds for his own benefit; and (2) the debtor did so with fraudulent intent or deceit. *Id.; Fischer Inv. Capital, Inc. v. Cohen (In re Cohen)*, 334 B.R. 392, 400 (Bankr.N.D.Ill. 2005); *Monroe*, 304 B.R. at 359. A fiduciary relationship or trust relationship need not be established in order to find a debt non-dischargeable by an act of embezzlement. *Pawlinski*, 170 B.R. at 390. Embezzlement differs from larceny only in that embezzlement requires that the original taking was lawful, or at least with the consent of the owner, unlike larceny, which requires that felonious intent exist at the time of the taking. *Kaye v. Rose (In re Rose)*, 934 F.2d 901, 903 (7th Cir.1991).

## IV. *DISCUSSION*

**A. Section 523(a)(2)(A) Claim**

**1. Count I**

In Count I of the complaint, the Creditor alleges that the Debtor, individually and doing business as H & W, made a false representation to the Creditor with respect to how the loan proceeds would be used. Specifically, the Creditor contends that the Debtor falsely represented to him that the loan proceeds discussed above would be used only on the 262 South Prospect Project. The Debtor and H & W had other ongoing projects that were underfunded and in need of additional monies to complete. According to the Creditor, the Debtor knew that the funds provided by the Creditor would be utilized for these other projects. Thus, the Creditor maintains that the Debtor made the representation that the funds would be used only for the 262 South Prospect Project with the intent of deceiving him. The Creditor alleges that he justifiably relied on the rep-

resentation made by the Debtor to his detriment. Finally, the Creditor maintains that had he known that the monies he loaned to H & W would be used for projects other than the one he discussed with the Debtor, he would not have loaned the funds.

■ First, the Court finds that the Creditor established that the Debtor made a false representation with respect to how the $350,000 loan proceeds would be utilized. The Creditor testified that the Debtor told him that the funds would be used only for the 262 South Prospect Project. The Debtor denied telling the Creditor that the monies would be used only on this Project. Rather, according to the Debtor, he told the Creditor that some of the funds would be used on the 262 South Prospect Project and some of the monies would be used for other projects. The Debtor testified that the Creditor intended to convert the debts into a general investment in HW Development, an entity that was never formed.

■ The Court is in the best position to assess the credibility of the witnesses and weigh the evidence. *See* *Anderson v. Bessemer City, N.C.*, 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (noting that deference is given to a trial court's findings that involve credibility of witnesses because only the trial judge can observe the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is stated); *Torres v. Wis. Dep't of Health & Soc. Servs.*, 838 F.2d 944, 946 (7th Cir.1988) (*citing Anderson*). "[A] court ... may take into account a witness' [s] interest in the outcome of the case, his intentions, his seeming honesty, and his conduct on the witness stand." *Fosco*, 289 B.R. at 87 (*citing Welch v. Tenn. Valley Auth.*, 108 F.2d 95, 101 (6th Cir.1939)).

Initially, the Court notes that both parties were impeached at trial with their respective deposition testimony. Such instances of impeachment focused on related collateral issues. Nevertheless, the Court was able to determine the credibility of both parties. Specifically, the Court observed the demeanor of the witnesses and finds the Creditor's testimony more credible than the Debtor's testimony. Additionally, the documentary evidence, in part, tends to support the Creditor's testimony. The Debtor's notes from the October 27, 2006 meeting between the Debtor and the Creditor indicated that three projects were discussed—Ruby and Colfax Streets and the 262 South Prospect Project. (Creditor Ex. No. 3; Debtor Ex. No. 3.) However, the notes about the Ruby and Colfax projects did not contain any dollar references. (*Id.*) Rather, there were question marks after the references to those projects. (*Id.*) With respect to the 262 South Prospect Project, however, the Debtor noted the amount of $250,000 to $350,000. (*Id.*) The Creditor testified that the $350,000 and $49,000 loans to H & W were specifically for the 262 South Prospect Project. The Debtor's handwritten notes from that meeting support the Creditor's testimony with respect to the $350,000 loan.

In addition, the Court finds that the communications between the Creditor and the Debtor support the Creditor's testimony that the $350,000 and $49,000 loans were to be used solely for the 262 South Prospect Project. The Debtor's e-mail message sent to the Creditor on April 4, 2008 discussed only the 262 South Prospect Project and listed items that were unpaid on that Project. (Creditor Ex. No. 14; Debtor Ex. No. 14.) Subsequently, on May 20, 2008, in another e-mail message to the Creditor, the Debtor admitted that the Creditor funded the 262 South Prospect Project. (Creditor Ex. No. 15; Debtor

Ex. No. 15.) The Debtor stated that in a future meeting with the Creditor he wanted to discuss "the project you funded at 262 [South] Prospect." (*Id.*) The e-mail also noted that if 262 South Prospect was to be sold for a loss in 2008, "[w]e would basically end up having a long term debt to you which [H & W] would repay over time with proceeds from other projects." (*Id.*) Further, the Debtor "presented the possibility of [the Creditor] taking ownership of 262 [South] Prospect, since *all of the equity in the project was provided by [the Creditor] and Lori* [his wife]." (Id.) (emphasis added). In another e-mail dated May 27, 2008, the Debtor told the Creditor that he wanted to "discuss our options with [262 South] Prospect. . . ." (Creditor Ex. No. 16; Debtor Ex. No. 16.) In that message, he also mentioned that the Creditor's "money from this project would be tied up longer than anyone wants." (*Id.*) In sum, these documents, which were drafted by the Debtor and sent to the Creditor, support the Creditor's testimony and understanding that the $350,000 and $49,000 loan proceeds were to be used solely for the 262 South Prospect Project.

The Debtor argues that the promissory notes and the Venture Agreement corroborate his testimony ·that the Creditor's funds were to be used by H & W for multiple projects. First, the promissory note dated January 13, 2007 stated that the principal amount of "$350,000, plus 20% of the net project profit on *underlying investment projects; relating to the construction project specified,* and as defined, in the Venture Agreement . . . shall be due and payable on the day of closing of the sale of the *single-family residence* specified in the Venture Agreement. . . ." (Creditor Ex. No. 4; Debtor Ex. No. 4.) (emphasis added). The Venture Agreement, in turn, provided that the $350,000 loaned by the Creditor would "be used to acquire and enhance real estate projects as

discussed." (Creditor Ex. No. 2; Debtor Ex. No. 2.) The Venture Agreement also addressed how the Creditor's $350,000 could be converted into a membership interest in HW Development, which had not yet been formed. (*Id.*) The term "net project profit" as used in the promissory note was defined in the Venture Agreement as "all gross profits and receipts derived by H & W in conjunction with the Construction Projects, less usual and customary costs and expenses incurred and paid in the construction and sale of the *aforesaid single-family residence . . . .*" (*Id.*) (emphasis added). Finally, the second promissory note dated April 4, 2008 for the $49,000 loan was entitled "PROMISSORY NOTE–Operating Capital." (Creditor Ex. No. 5; Debtor Ex. No. 5.)

▇ These documents refer to "underlying investment projects," "construction project specified," "single-family residence," "Construction Projects," and "aforesaid single-family residence." However, these terms are not defined anywhere in the first promissory note or the Venture Agreement. The fact that some of these phrases are plural and could reference several projects and that other terms are singular and could mean a single project does not weigh heavily in favor of either the Creditor's or Debtor's position. Such ambiguities are construed against the Debtor who created the documents. *See Bourke v. Dun & Bradstreet Corp.,* 159 F.3d 1032, 1036 (7th Cir.1998). Accordingly, the Court finds that these documents do not definitively demonstrate that the Creditor's $350,000 and $49,000 loans were to be utilized on several projects as the Debtor contends.

Instead, the Debtor's handwritten notes of the October 27, 2006 meeting between him and the Creditor, as well as his e-mail messages of April 4, 2008, May 20, 2008, and May 27, 2008, are stronger and more

persuasive evidence that the Debtor and the Creditor agreed that the $350,000 and the $49,000 loans to H & W would be used to fund only the 262 South Prospect Project. In his notes of the meeting, the only project that includes a dollar amount is the 262 South Prospect Project. (Creditor Ex. No. 3; Debtor Ex. No. 3.) Further, in the e-mail communications, the Debtor specifically mentions only the 262 South Prospect Project. (Creditor Ex. Nos. 14–16; Debtor Ex. Nos. 14–16.) The Debtor's reference to the Creditor providing all of the equity for and funding the 262 South Prospect Project further supports the Creditor's testimony that the $350,000 and $49,000 loans were to be utilized for that Project alone.

The Debtor points to the phrase "Operating Capital" in the title of the $49,000 promissory note and the language in his two April 4, 2008 e-mail messages to the Creditor wherein he thanked the Creditor for his "continued support for our business" and "for the $49,000 operating capital you have contributed this year to keep our business afloat" in support of his argument that the $49,000 loan proceeds were to be used by H & W on multiple projects. (Creditor Ex. Nos. 5 & 14; Debtor Ex. Nos. 5 & 14.) The Court finds that these general references do not establish that those funds were to be used by H & W on projects other than the 262 South Prospect Project. While the first April 4, 2008 e-mail communication from the Debtor to the Creditor thanked the Creditor for his "continued support" of H & W, that message went on to discuss the 262 South Prospect Project and the remaining items that were unpaid on that Project. (Creditor Ex. No. 14; Debtor Ex. No. 14.) Moreover, on May 20, 2008, the Debtor sent the Creditor another e-mail message wherein he mentioned the $49,000 promissory note but primarily discussed "the project you funded at 262 [South] Prospect." (Creditor Ex. No. 15; Debtor Ex. No. 15.)

The Debtor acknowledged in that communication that all of the equity in the 262 South Prospect Project was provided by the Creditor and his wife. (*Id.*) Hence, the Court is persuaded by the documentary evidence and the Creditor's testimony that the $49,000 loaned by the Creditor to H & W was for the 262 South Prospect Project.

■ Next, based on the evidence, the Court finds that the Creditor established that the Debtor intended to deceive the Creditor. The Court can reasonably infer an intent to deceive on the part of the Debtor because the facts portray a clear-cut "picture of deceptive conduct" by him. *See Cent. Credit Union of Ill. v. Logan (In re Logan),* 327 B.R. 907, 911 (Bankr. N.D.Ill.2005). The Court finds that the Creditor showed that the Debtor knowingly misrepresented and misled him with respect to how the $350,000 and the $49,000 loan proceeds were to be utilized. As previously stated, the totality of the more credible evidence demonstrates that the understanding was that the Creditor's $350,000 and $49,000 loans would be used solely for the 262 South Prospect Project. The Debtor admitted that he intended to use those proceeds for other H & W construction projects. Indeed, the Debtor testified that he deposited the Creditor's funds into H & W's general operating account and used those monies on projects other than 262 South Prospect. The Court can, thus, infer an intent to deceive by the Debtor because he admittedly utilized the Creditor's $350,000 and $49,000 loan proceeds for other H & W construction projects.

■ Finally, the Court must determine whether the Creditor has met the justifiable reliance element of proof required under § 523(a)(2)(A). Looking at the totality of the evidence and all the facts and circumstances of this particular matter, the Court concludes that the Creditor justifiably relied on the Debtor's misrepresen-

tation in advancing the loan proceeds. The Creditor's firm, Deady Roofing, had worked on several previous construction projects on which H & W was the general contractor. As a result, the Creditor testified that he trusted the Debtor. He had no duty to further investigate because the falsity of the Debtor's representation was not readily apparent at the time. Finally, the Creditor testified that had he known that the Debtor would be using his monies on projects other than the 262 South Prospect Project, he would not have invested those funds with H & W. Thus, the Court finds that the Creditor has demonstrated the justifiable reliance element of § 523(a)(2)(A).

 Next, the Court must determine whether the $15,635.19 debt is non-dischargeable under § 523(a)(2)(A). The Court finds that the Creditor has failed to establish that the Debtor made a false representation in connection with that debt. The Creditor does not allege that the Debtor failed to use this money for the 262 South Prospect Project. Rather, the Creditor testified that he loaned H & W $15,635.19 for the purchase of the appliances for 262 South Prospect. There was no evidence adduced to show that this sum was not used for those appliances. In fact, the realtor's information sheet, as well as the multiple listing for 262 South Prospect, described the various appliances included with the property, all of which were apparently bought with the funds loaned by the Creditor. (Creditor Ex. Nos. 19 & 20; Debtor Ex. Nos. 19 & 20.) The 262 South Prospect Project sold for the sum of $1,100,000, and the closing statement did not indicate any credits to the purchaser for missing appliances. (Creditor Ex. No. 18; Debtor Ex. No. 18.) While the Creditor was not repaid the $15,635.19, the Debtor's mere failure to pay that debt, even if intentional and without excuse, is not actionable under § 523(a)(2)(A). *See Schubbe Resch Chiropractic & Physical*

*Therapy Ctrs. v. Norton (In re Norton)*, 248 B.R. 131, 133–34 (Bankr.W.D.Wis. 2000).

In sum, the Court finds that the Creditor has proved the requisite elements for the $350,000 and the $49,000 debts (less the $9,000 repayment) to be found non-dischargeable under § 523(a)(2)(A) on the basis of false representation. However, the Creditor has failed to show all of the necessary elements with respect to the $15,635.19 debt.

**2. Count II**

 Next, in Count II of the complaint, the Creditor alleges the same facts as in Count I and contends that the debts should be excepted from discharge based on actual fraud by the Debtor. For the same reasons articulated *supra* with respect to Count I of the complaint, the Court finds that the Creditor has established all of the requisite elements for the loans of $350,000 and $49,000 (less the $9,000 repayment) to be found non-dis-chargeable under § 523(a)(2)(A) on the basis of actual fraud. The Court finds that the Debtor committed fraud. He deceived the Creditor when he told him that the $350,000 and $49,000 loan proceeds would be used for only the 262 South Prospect Project. Moreover, the Debtor intended to defraud the Creditor as discussed *supra* with respect to Count I of the complaint. Further, the fraud created the debts that are the subject of this dispute.

The Court finds, however, for the same reasons articulated in the discussion of Count I, that the Creditor has failed to establish that the $15,635.19 debt is non-dischargeable under § 523(a)(2)(A) as a result of actual fraud.

**B. Section 523(a)(4) Claim**

**1. Count III**

In Count III of the complaint, the Creditor alleges that the Debtor's actions consti-

tute defalcation with respect to the loan proceeds. Specifically, according to the Creditor, H & W received the monies from the Creditor with the express understanding that the funds would be used for only the 262 South Prospect Project. Further, the Creditor contends that the Debtor stood as a fiduciary with respect to the loan proceeds and that a trust was created for the Creditor's benefit.

■ The Court finds that the Creditor has failed to establish that a fiduciary relationship existed among him, the Debtor, and H & W. There is no evidence that such a relationship existed prior to the events discussed herein. Further, there was clearly no express trust created between the parties. None of the documentary evidence revealed a trust. In addition, the Court finds that the evidence fails to establish that the Debtor held a position of ascendancy or control over the Creditor. The fact that the Creditor had previously invested in real estate and was an experienced roofing contractor before becoming involved with the Debtor put him on even footing with the Debtor.

■ Neither the Creditor's loans to the Debtor's company, H & W, nor the failure of H & W to repay the Creditor creates a fiduciary relationship among the Creditor, H & W, and the Debtor. While a clear breach of the contractual duties under the promissory notes, the nonpayment does not rise to the level of fraud or defalcation. "A breach of contractual duties is not functionally equivalent to fiduciary fraud, defalcation, embezzlement or larceny." *Rae v. Scarpello (In re Scarpello)*, 272 B.R. 691, 703 (Bankr.N.D.Ill. 2002). A contractual debtor/creditor relationship also does not rise to the level of a fiduciary relationship. *Lexington Health*

*Care Ctr. of Elmhurst, Inc. v. McDade (In re McDade)*, 282 B.R. 650, 659 (Bankr. N.D.Ill.2002). Hence, the Court finds that the Creditor's claim under § 523(a)(4) that the Debtor committed defalcation while acting in a fiduciary capacity fails.

**2. Count IV**

■ Next, in Count IV of the complaint, the Creditor contends that the Debtor embezzled the loan proceeds entrusted to him by using those funds for unauthorized purposes. According to the Creditor, the Debtor hid the improper use of those funds by failing to permit the Creditor access to H & W's checking account so that the Creditor could determine how the loan funds were being utilized.

The Court finds that the Creditor has failed to establish that the Debtor embezzled the loan proceeds. The Creditor has failed to proffer any evidence to show that the Debtor appropriated any of the Creditor's funds for his own benefit or that he did so with fraudulent intent and deceit. The evidence demonstrated that the Debtor deposited the Creditor's funds into H & W's operating account. Moreover, the evidence established that H & W spent more than $350,000 on the 262 South Prospect Project. (Creditor Ex. No. 8; Debtor Ex. No. 8.) There was no evidence to show that the Debtor appropriated the funds for his own benefit. The fact that the Debtor did not provide the Creditor access to H & W's operating account records does not demonstrate that the Debtor used the Creditor's funds for his own personal benefit. Accordingly, the Creditor's claim under § 523(a)(4) that the Debtor embezzled the loan proceeds fails.

**C. The Debtor's Affirmative Defenses**

■ The Debtor asserts two affirmative defenses to the complaint. First, the Debtor contends that the complaint is based upon the Venture Agreement and

promissory notes between the Creditor and H & W. As a result, the Debtor claims that the complaint fails to state a claim upon which relief can be granted as to him. The Court finds that this affirmative defense lacks merit. The basis of the instant complaint is not the Venture Agreement and promissory notes. Rather, the complaint alleges misrepresentation, fraud, defalcation, and embezzlement by the Debtor as a manager and/or member of H & W. That the Venture Agreement and promissory notes were entered into between the Creditor and H & W does not preclude the Creditor from bringing a § 523(a)(2)(A) or § 523(a)(4) claim against the Debtor personally, as the agent of H & W, for his alleged misrepresentation, fraud, defalcation, and embezzlement.

 H & W was a limited liability company—an artificial entity—that could act only through its members or managers. The Court finds that the Debtor, a member and/or manager of H & W, acted as its agent. An allegation of fraud against an agent of an entity can be the basis for a dischargeability action against the agent. *See generally Hemelt v. Pontier (In re Pontier)*, 165 B.R. 797 (Bankr. D.Md.1994). After all, "[a]gents are liable for their own torts." *Pretzel & Stouffer, Chartered v. Imperial Adjusters, Inc.*, 28 F.3d 42, 46 (7th Cir.1994). Agents are personally liable for torts they commit even though performed in the name of an artificial entity. *Miller v. Simon*, 100 Ill. App.2d 6, 241 N.E.2d 697, 700 (1968). Hence, this affirmative defense fails.

 As for the second affirmative defense, the Debtor attempts to reserves the right to assert any other claims or defenses as may become available. "A reservation of unpled defenses is not a defense of any kind, much less an affirmative one." *Fogel v. Linnemann (In re Mission Bay Ski & Bike, Inc.)*, Ch. 7 Case No. 07 B 20870, Adv. No. 08 A 0055, 2009 WL 2913438, at *5 (Bankr.N.D.Ill. Sept.9, 2009). Accordingly, the Court denies this purported affirmative defense.

## V. CONCLUSION

For the foregoing reasons, the Court finds that the Creditor has demonstrated that the loans of $350,000 and $49,000 (less the $9,000 repayment) he made to the Debtor are non-dischargeable under § 523(a)(2)(A). However, the Creditor has failed to show that the additional $15,635.19 loan is non-dischargeable under § 523(a)(2)(A). Further, the Creditor has failed to demonstrate that any of the debts are non-dischargeable under § 523(a)(4).

This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate order shall be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.